ELISHA J. CAMPBELL *vs.* GEORGE E. CAMPBELL, *et al.*

JULY 6, 1909.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1) *Procedure. Limiting Number of Witnesses. Judicial Discretion.*

Upon the trial of a probate appeal, appellant's counsel was, at practically the usual hour of adjournment, ordered by the court to go on with the case that evening, when he had no other witnesses present, or name to the court the witnesses he would call the next morning, the court stating that he would hold counsel "pretty rigidly to your number of witnesses to-morrow."

Thereupon counsel named two witnesses. On the following day, counsel offered the testimony of a witness whom he had not named, as to a matter which he had overlooked, and the court excluded the evidence, relying upon the agreement:—

*Held*, that, while each case must be decided upon its own special facts and circumstances, and while the court has discretion to limit the number of witnesses upon a particular point, yet this discretion must be so used as not to impair the rights of the parties; there must be no abuse of discretion, and if there is, it is reversible error.

*Held*, further, that the agreement was made under compulsion, and the action of the court was not a proper exercise of judicial discretion.

*Held*, further, that although the testimony of the witness might have been, as to one point, cumulative, yet the party holding the weight of evidence should have the opportunity to bring it to bear upon the jury when it concerns the real issue.

PROBATE APPEAL. Heard on exceptions of appellant, and sustained. Blodgett, J., dissents.

JOHNSON, J. The plaintiff filed, in the Municipal Court in the city of Providence, his claim against the estate of James Campbell, his father, late of said Providence, deceased, for

$15,550. This claim was made up as follows: $10,000, due on a promissory note given for work and labor, and money loaned by the plaintiff to his father; $4,050, due from his father for two years' and three months' wages, at $150 per month, from April 1, 1902, to June 28, 1904; and $1,500, due for money loaned his father from April 1, 1902, to June 28, 1904. The estate having been declared insolvent, and commissioners appointed, said claim of $15,550 was in part allowed by the commissioners, to the extent of $2,700 for work and labor for two years and three months, at the rate of $100 per month. From this allowance the plaintiff appealed to the Superior Court, where the jury awarded him a verdict for $3,024.

The plaintiff filed a motion for a new trial, which was denied; and the case is now before this court on the plaintiff's bill of exceptions—the exceptions being as follows:

1. To certain rulings of said justice at the trial of said action in respect to certain evidence, as shown on pages 133 and 252 of the transcript of testimony filed herewith.

2. To the ruling of said justice at the trial of said action, not permitting a certain witness to testify, as shown on pages 602, 603, 610, 611, and 612 of said transcript of testimony filed herewith.

3. To the decision of said court denying the plaintiff's motion for a new trial, which motion was based upon the following grounds:

(a) That said verdict and finding was against the law.

(b) That said verdict and finding was against the evidence and the weight thereof in that said verdict and finding should have been for a much larger sum.

(c) That said verdict and finding was against the evidence and the weight thereof in that the jury should have found, in addition to the amount they did, the amount of the note in said cause, and interest thereon from the date of said note.

(d) That said verdict and finding was against the law and the evidence and the weight thereof.

(e) That the amount of said verdict and finding was entirely inadequate and insufficient.

(f) That the appellant had discovered new and material evidence which he had not discovered at the time of the trial of said cause, and which he could not have discovered at said time by the exercise of reasonable care.

We think that the exception secondly set out in the bill, viz.: "To the ruling of said justice at the trial of said action, not permitting a certain witness to testify, as shown on pages 602, 603, 610, 611, and 612 of said transcript of testimony filed herewith," should be first considered.

To understand the exception, it is necessary to recur to page 610 where the witness was offered and the objection made, The record follows:

"Mr. Waterman—Mr. Bradford Campbell.

"Mr. Champlin—I shall have to object to the testimony of this witness. Mr. Waterman made an agreement with us and with the court last night, and I shall insist that that agreement is kept.

"Mr. Waterman — Now, if your honor please, at that time I said there might be one thing that I had overlooked in the testimony, in the haste of closing up. There is one thing that I have overlooked, and that is the statement of Mrs. Rebecca Campbell as to Mr. Bradford Campbell coming up at one time and getting the signature to a note, and that is what I want to examine him about. I will limit my examination to that, although I would like to examine him as to Mr. James Campbell's condition during the time mentioned. We didn't have him here yesterday because, as I said, I thought we had enough witnesses to fill the day up, and we did not go to undue expense to get him in.

"Mr. Champlin—This man is a son of Elisha J. Campbell, lives with him, and they could have had him here any time they chose. Last night your honor told Mr. Waterman that unless he would name the witnesses, you would go ahead on this case last night, and you waited for him to name the witnesses. He insisted that he would put on whatever witnesses he could get. Your honor told him then you would go ahead with the trial last night unless he would name them, and you would hold him strictly to the agreement. He finally said that he

would name three persons, and then eventually he got up and said he would take one of those persons out, and he would put on only those two persons, and he named those two persons. With that information we had from him, and with your honor's statement that you would hold him strictly to his agreement, we have made no preparation whatever to meet anything except the testimony of those two witnesses. We are not bound, under that agreement and under the ruling of your honor, to meet the testimony of this witness. He is going to contradict, perhaps, the testimony of Mrs. Rebecca Campbell. Mrs. Rebecca Campbell's deposition is in here. It would put us in the position to bring her in at the twelfth hour, and either make us go to the jury with an unfinished case, or ask your honor to take the deposition of Mrs. Rebecca Campbell.

"BY THE COURT—I shall hold you to your agreement, Mr. Waterman.

"MR. WATERMAN—Will your honor note my exception?

"BY THE COURT—I note your exception."

As the court's ruling refers to and is based upon an agreement made by Mr. Waterman, the appellant's attorney, it becomes necessary to find out what the agreement was. Recurring to page 602 of the transcript of evidence, we find the following record:

"At 4:50 P. M., counsel for appellant asks that the trial of the case be adjourned until the following morning, and states that he has been unable to reach other witnesses whom he intends to procure in behalf of the appellant in rebuttal.

"BY THE COURT—How many more witnesses are you going to call to-morrow?

"MR. WATERMAN—We expect to get Mr. Collins, of course, Mr. Hawkins, and Mr. Vial we intend to see, and—that is all that I can say definitely about now.

"BY THE COURT—I shall hold you pretty rigidly to your number of witnesses to-morrow because I am ready to go on now, and I certainly, of course, you understand, the situation. I do not desire to handicap your case in any way, but it is a simple necessity on my part. I want a distinct understanding

before we separate to-night, the case is to be held down very close to-morrow morning on the number of witnesses. I don't think I am unfair in asking you to specify now exactly what you propose to do in the morning.

"MR. WATERMAN — In order to expedite the matter, if your honor please—of course, I will state that I didn't know the court was going to sit overtime to-night, and I thought we had enough testimony to fill up the time until adjournment, and did not like to ask business men, who would not be needed to-day, to come twice. In order to expedite the matter, I will agree to put on simply those that I know about—Mr. Collins and Mr. Hawkins. They will both testify as to his condition.

"BY THE COURT—Now, then, gentlemen on the other side, you understand what you have to meet, and I shall expect you to go on with your case, too, as soon as they have finished theirs. On that condition, we will stop now till half-past nine to-morrow morning." . . .

(1)     It is well settled that the trial court, in the exercise of a sound and reasonable discretion, may limit the number of witnesses that may be allowed to testify on a given point. "If it were otherwise, the length of a trial could be protracted to an unreasonable and unwarrantable extent, and the time of the court consumed by the useless and unnecessary reiteration of testimony." *Outcalt* v. *Johnston,* 9 Colo. App. 519. "But the discretion must be reasonably exercised, so as to deprive the parties of no material rights, and an abuse of it in this respect will be reversible error." *Burhans* v. *Norwood Park,* 138 Ill. 147; *Ragsdale* v. *Southern Ry. Co.,* 121 Fed. 924; *Jones* v. *Glidewell,* 53 Ark. 161; *Huett* v. *Clark,* 4 Colo. App. 231; *Union National Bank* v. *Baldenwick,* 45 Ill. 375; *Mueller* v. *Rebhan,* 94 Ill. 142; *Mergentheim* v. *State,* 107 Ind. 567; *Butler* v. *State,* 97 Ind. 378; *Kesee* v. *Chicago, etc., R. Co.,* 30 Iowa, 78; *State* v. *Pratt County,* 42 Kan. 641; *Burt-Brabb Lumber Co.* v. *Crawford,* 27 Ky. L. Rep. 798, 86 S. W. Rep. 702; *Cushing* v. *Billings,* 2 Cush. (Mass.) 158; *State* v. *Whitton,* 68 Mo. 91; *Biester* v. *State,* 65 Neb. 276; *Anthony* v. *Smith,* 4 Bosw. (N. Y.) 503; *Powers* v. *McKenzie,* 90 Tenn. 167;

*Meier* v. *Morgan*, 82 Wis. 289; *Bunnell* v. *Butler*, 23 Conn. 65; *Nolton* v. *Moses*, 3 Barb. (N. Y.) 31.

"Where the point in dispute is collateral to the main issue, as in the case of impeaching or sustaining a witness, or in the case of impeaching or sustaining the character of a party whose character is not directly in issue, the trial court has wide discretion in the matter of limiting the number of witnesses." 8 Am. & Eng. Ann. Cas. note p. 829.

In *St. Louis R. Co.* v. *Aubuchon*, 199 Mo. 352, 8 Am. & Eng. Ann. Cas. 822, at p. 823, the court says: "On collateral and incidental issues, as for example the general reputation of a witness, or an issue upon a motion for a change of venue, or for costs, etc., it is a wise and settled rule to allow trial courts wide discretion." *Outcalt* v. *Johnston*, 9 Colo. App. 519; *Bunnell* v. *Butler*, 23 Conn. 65. See collection of cases in note, 8 Am. & Eng. Ann. Cas. p. 829. Great latitude is also allowed trial courts in limiting the number of expert witnesses on a single point. See cases collected in note, 8 Am. & Eng. Ann. Cas. p. 829. A distinction has, however, been made where the fact to be established is not sworn to directly by witnesses, but must be established by proof of other facts from which the existence or non-existence of the fact in controversy may be inferred.

In *Green* v. *Phœnix Mut. Life Ins. Co.* 134 Ill. 310, the court says: "One of the important questions involved at the hearing was whether, at the time of the execution of the trust deeds, and the subsequent sale thereunder, and from thence to shortly before the filing of the original bill, appellant had been and was insane. . . . The law presumes the fact of sanity, and hence the burthen is cast upon the party alleging insanity to establish it by a preponderance of proof. No rule can be formulated as to the quantum of evidence necessary to establish insanity, otherwise than that it must be sufficient to overcome the legal presumption of sanity, and to overbalance the testimony tending to sustain such presumption. This preponderance of evidence necessary to satisfy the judicial mind does not, as a matter of course, depend upon the number of witnesses testifying on either side, but when all are apparently

possesssed of the same means of knowledge, and are equally intelligent and credible, the greater number must generally prevail. The trial court must, of necessity, exercise discretion as to the number of witnesses to prove a given fact that is not disputed, or that is merely collateral to the main issue, depending very much upon the nature and subject matter of the inquiry. . . . The phases of insanity and the facts and circumstances which may tend to establish, and are proper for consideration, are so numerous and varied that a great number of witnesses may be required to determine the fact in issue. And it is found that persons of equal intelligence differ in opinion as to the inference to be drawn from such facts and circumstances. In such cases great latitude has always been allowed, and should prevail. . . . It must be apparent that the limitation of witnesses in such cases to an equal number on each side, as was here done, even supposing they were of equal credit, and had equal means of knowledge, would be to defeat the party holding the affirmative of the issue. The court may undoubtedly limit the number of witnesses called as experts and in some cases for the purpose of impeachment. . . . It should, however, be understood that in such cases the exercise of the discretion must be reasonable. The court may not arbitrarily determine the number of witnesses that may testify in such cases."

In *Galveston, etc., R. Co.* v. *Matula*, 79 Tex. 577, the court says: "There must exist in every court the power to determine when evidence purely cumulative shall cease, or there would be no limit to trials, and the exercise of such a discretion would be no ground for reversal of a judgment unless it was made to appear that this had been abused. Such a power is one, however, to be exercised with the utmost care; and in a case where there is little or no controversy as to a given fact, such evidence might properly be cut off where it would be improper to do so when the evidence was greatly conflicting. In a case in which a fact to be established is not sworn to directly by witnesses, but must be so established by proof of other facts from which the main fact is to be inferred, then evidence of different facts from which the inference may be

drawn is not strictly cumulative. From the bill of exceptions it may be inferred that the court below refused to hear further evidence tending to prove the controverted fact or 'subject' because other evidence, although not to the same facts, had been introduced tending to prove the same issue. If this was the ruling it was erroneous."

*Ward* v. *Dick*, 45 Conn. 235, was an action for slander, in charging plaintiff with dishonesty. Defendant offered evidence of plaintiff's bad reputation in that respect. The court limited him to ten witnesses. Held ground for granting a new trial. The court said: "The subject matter of the inquiry was the value of a reputation. To the law this is a tangible thing; it is property in the highest sense; and we are not aware that in actions for injuries to property courts have assumed the right, either to prevent the plaintiff from establishing the value thereof at the highest possible point to which he could carry it by the power of testimony, or the defendant from diminishing it by the same means; and actions for injuries to character are not exceptions.

"It is true that in *Bunnell* v. *Butler*, 23 Conn. 65, this court sanctioned a limitation upon the number of witnesses to be heard in the matter of the impeachment of the character of a witness for truth; but that character was not the ground of the action. It could at most only affect the weight to be given to the testimony of one witness; and he may have been one of many to the same point, and not at all essential to the support of that; and the point, if established, may have been of very little importance. And in other instances courts have restricted the number of witnesses giving opinions upon matters collateral to the main issue. Character, for the purposes of a judicial investigation, is the aggregate of opinions expressed concerning an individual by those who know him; and a name good or bad is most firmly established where the testimony of credible witnesses covers the widest range of the life of the person who bears it. Therefore, where as in the the case before us the life of the plaintiff has been broken into sections by changes of residence from one locality to another, the defendant was entitled to the privilege of showing that in

each there was a preponderance of opinion adverse to his good name. Again, it may often happen that a few only can be found on the one hand to sustain or on the other to disparage the name of an individual, while the great body of opinion is in each case on the other side. In such instances the effect of a limitation is to render it easy for the few to make it appear to the jury that public opinion rests at the equipoise upon the name in question, when the fact is quite otherwise."

In *South Danville* v. *Jacobs*, 42 Ill. App. 533, the court said: "We are aware of no rule authorizing the court to limit the number of witnesses a party may introduce, unless it be upon some question collateral to the main issue. If a fact is sufficiently proven and is not controverted, or if it is expressly admitted by the adverse party, a court may, in the exercise of a sound discretion, refuse to allow its time to be wasted in hearing further evidence. When, however, a controlling fact is controverted, each party has the right to have all witnesses heard who have knowledge of facts and circumstances bearing upon the contested point, and to deny the right is error."

And in *Pritchard* v. *Henderson*, 3 Penn. (Del.) 128, the court held that a rule of the court which permits but six witnesses to be examined on a side as to a single fact, does not apply where the matter inquired about is the mental condition of the testator. In such case the question relates, not to a single point, but to a condition that grows out of a number of observations. See also *Nelson* v. *Wallace*, 57 Mo. App. 397; *Fisher* v. *Conway*, 21 Kan. 18; *Barhyte* v. *Summers*, 68 Mich, 341; *Union Natl. Bank* v. *Baldenwick*, 45 Ill. 375.

The case at bar differs from the cases of limitation to a given number of witnesses on each side upon a particular point, but as the court's ruling had the effect to limit the number of witnesses for the plaintiff in rebuttal, we have examined a great many cases in which, for one reason or another, the number of witnesses has been limited by the court.

From our examination of the cases, the net result appears to be that each case must be decided upon its own special facts and circumstances. The court necessarily has discretion to limit the number of witnesses upon a particular point. If it

were otherwise, a trial could be drawn out to an unreasonable and unwarrantable extent and the time of the court consumed by the useless reiteration of testimony. This discretion must, however, be so used as not to impair the rights of the parties. There must be no abuse of discretion, and if there is, it is reversible error.

The record shows that the appellant's counsel was, at 4:50 P. M., practically at the usual time of adjournment, confronted with a demand, on the part of the court, that he go on with the case that evening, when he had no other witnesses present, or name to the court the witnesses whom he would call the next morning. To this was added the statement, "I shall hold you pretty rigidly to your number òf witnesses tomorrow, because I am ready to go on now and I certainly— of course, you understand the situation. I do not desire to handicap your case in any way, but it is a simple necessity on my part." The court's readiness to go on that night was announced, then, without any previous notice that the session would continue beyond the usual time. He said he did not want to handicap appellant's case, "but it is a simple necessity on my part." What the necessity was the court did not state. He also added: "I want a distinct understanding, before we separate to-night, the case is to be held down very close to-morrow morning on the number of witnesses." If the court had positively required appellant's counsel to go on at that time, he doubtless would have excepted, and that question would now be before us. But the requirement that he then go on with the case was used as the alternative and the inducement to compel counsel to name and thereby limit the number of witnesses he would examine upon the following day. The court then said to counsel for the appellees: "I shall expect you to go on with your case, too, as soon as they have finished theirs." Quite a natural expectation, it would seem. No limitation of witnesses was, however, imposed upon them.

The agreement, as we have seen by the record, was relied upon by the court in excluding the testimony of the witness Bradford Campbell. Counsel for the appellee argue earnestly

as to the same, and lay stress upon its being "offered by Mr. Waterman in violation of his agreement made in open court, in presence of his client." The transcript shows the conditions clear enough, we think.

There are before us, however, in regard to the transcript, certain affidavits filed with a petition to establish the exceptions. Mr. Waterman, counsel for appellant, made an affidavit, in which he stated that the colloquy incident to the above, as reported in the transcript of evidence in said case, is only a part of the colloquy which actually took place at the time, and that counsel for the appellant "did at the time strenuously object to being forced to choose between said two alternatives." The affidavit of Mr. Van Slyck, also counsel for the appellant, is to the same effect. The court stenographer who took the testimony in the case also made an affidavit in which, after stating the request for an adjournment by appellant's counsel on December 19th, he said "that thereupon there ensued a colloquy which I did not note stenographically and which does not appear in the proceedings reported by me; and that I again began to make notes when the court asked, ' How many more witnesses are you going to call to-morrow.'" There appears also, on page 611 of the transcript, in the remarks of Mr. Champlin, of counsel for the appellee, the following statement: "Last night your honor told Mr. Waterman that unless he would name the witnesses, you would go ahead on this case last night, and you waited for him to name the witnessses. He insisted that he would put on whatever witnesses he could get. Your honor told him then you would go ahead with the trial last night unless he would name them, and you would hold him strictly to the agreement." While the affidavits do not add to the substance of the transcript, still, taken in connection with the statement of Mr. Champlin in the transcript itself, we think they indicate quite clearly that the submission of Mr. Waterman to the court's action was not quite so lamb-like as counsel for the appellee now try to make it appear.

We think it is clear that the agreement was made under compulsion. The appellant's counsel was forced either to close his case in rebuttal then and there on the testimony which he

had already put in, or name the witnesses whom he would call on the following day. The trial justice also told him that he should hold him pretty rigidly to his number of witnesses on the following day. We do not think that this was a proper exercise of judicial discretion. It is true that the plaintiff did not then and there except. But if the court's action on December 19th technically escaped being error, only because not excepted to at that time, neither said action nor its consequence, the agreement of appellant's counsel referred to, can avail to support and make proper the ruling on the 20th of December, refusing to permit Bradford Campbell to be called as a witness. The latter ruling was excepted to, and was clearly erroneous unless justified by the agreement referred to by the trial justice in making the ruling. The justification having failed, the ruling is not assisted thereby.

Counsel for the appellees further argue that the exception "should be overruled because it appears by the statement of plaintiff's counsel, above quoted, that he offered the testimony of Bradford Campbell solely to contradict the testimony of Rebecca Campbell as to the former's going to the house of James Campbell, at one time, and getting his signature to a note (transcript of testimony, p. 611). The ruling of the court and the exception of counsel are confined to the testimony of Bradford Campbell in that particular only. A comparison of the affidavit of Bradford Campbell with the deposition of Rebecca Campbell, shows no contradiction in that particular.

" The testimony of Bradford Campbell was not offered for the purpose of showing that James Campbell was of sound mind, and the ruling of the court does not extend to such a matter. But in any event, such testimony would have been cumulative. The attention of the court is called to the following excerpts from the deposition of Rebecca Campbell—'Q. 30. Did he (Bradford Campbell) ever stay here in the last years of your husband's life? A. He didn't live here. Once in a while he would come in the evening if he went to a place of amusement. He would come here and stay occasionally over night. Q. 184. Do you remember at any time that Elisha sent his son to try to get one of those blank notes signed?

A. Yes, sir, I do.  Q. 185. What was done?  A. For all I know, he got his grandfather to go into the other room and sign something.  I didn't see what it was, but the boy came here and had something signed.  I said, ' What is the matter now? ' He was kind of—' (Objected to)."  Cross-examination.  "XQ. 487. When was it that Bradford Campbell came up here? A. I could not tell you.  It was—I know he came here one night, I went out. I said, ' What are you doing now? ' XQ. 488. Never mind what he said to you.  About when was it that he came?  A. I don't know what time he came.  It was some time before he died.  XQ. 492. Might it have been more than two years before he died?  A. I should think it was all of that. All the dates I have not got.  XQ. 493. What did he have? A. He said that his grandfather had signed some notes.  XQ. 494. Did you see what it was?  A. No, I didn't see anything. Brad told me his grandfather had signed some notes, the signature was not right, and he wanted a good signature.  That is what Brad told me.  XQ. 495. Did you see the notes?  A. No, I did not.  That is all I know, is what he said.  XQ. 496. Did you see the notes that your husband signed at that time?  A. What notes did he sign—  XQ. 497. When Bradford came up here?  A. No, I didn't see anything; but he said that it was some notes that his grandfather had signed, or some checks that he had signed, the signature was'nt right, and he wanted a good signature.  XQ. 498. You could have seen them if you wanted to?  A. I suppose so.  XQ. 500. You thought Mr. Campbell was perfectly able to look out for himself?  A. No, I did not.  XQ. 504. Didn't you see whether this note, or whatever was signed at that time, was blank?  A. I didn't see it at all."  Counsel then argue:  "From the testimony above quoted, it appears that Bradford Campbell's affidavit, so far as it refers to James Campbell's signing blank notes, is unimportant, since Mrs. Campbell did not testify that Bradford Campbell ever took any blank notes to James Campbell and secured his signatures thereon.  Bradford Campbell's statement that he frequently passed the night at James Campbell's home is in substantial accord with Mrs. Campbell's testimony.  His statement that he never noticed any peculiarities in James Campbell is in con-

tradiction of several of the defendants' witnesses, particularly expert witnesses, and is simply corroborative testimony of other witnesses who testified in behalf of the plaintiff."

As to the testimony of Rebecca Campbell, she did testify as follows: "Q. 184. Do you remember at any time that Elisha sent his son to try to get one of those blank notes signed? A. Yes, sir, I do. Q. 185. What was done? A. For all I know, he got his grandfather to go into the other room and sign something. I didn't see what it was, but the boy came here and had something signed. I said 'What is the matter now?' He was kind of—" (Objected to.) This testimony was not very definite as to her knowledge, and may have been weakened by the cross-examination above-quoted, but there was the direct statement, in answer to the question, "Do you remember at any time that Elisha sent his son to try to get one of those blank notes signed?" "Yes sir, I do." The indefiniteness of the testimony of the witness on cross-examination should not deprive the appellant of the right to call Bradford Campbell to rebut the testimony given and state the facts as to his being there and his reasons for being there, and what was done by James Campbell on that occasion.

As to the statement of counsel for the appellee, that the testimony of Bradford Campbell was not offered for the purpose of showing that James Campbell was of sound mind, and that the ruling of the court does not extend to such a matter, if we turn to page 610 of the transcript we find that Bradford Campbell was called as a witness by Mr. Waterman, and objection was made by Mr. Champlin, stating the ground that "Mr. Waterman made an agreement with us and with the court last night, and I shall insist that that agreement is kept." Mr. Waterman then made the statement quoted *supra*, saying therein: "I will limit my examination to that (the statement of Rebecca Campbell) although I would like to examine him as to Mr. James Campbell's condition during the time mentioned. We didn't have him here yesterday because, as I said, I thought we had enough witnesses to fill the day up, and we did not go to undue expense to get him in." The offer to limit his examination to one matter was plainly made as a con-

cession in order to have him permitted to testify at all. As the concession offered did not avail, we do not think the court's ruling can be assisted by it. The witness was offered generally, to testify to what he could properly testify to in rebuttal.

It is also urged that, in any event, his testimony as to the mental condition of James Campbell would have been cumulative. Upon that point we think the language of the court in *Ward* v. *Dick, supra,* 45 Conn, 235, at p. 237, is entirely in point—" We know no better rule than to allow the party holding the weight of evidence an opportunity to bring it to bear upon the jury, when it concerns the real issue."

An affidavit of Bradford Campbell has been filed, which reads as follows: "I, Bradford Campbell, of the city and county of Providence, State of Rhode Island, on oath depose and say that I am the son of Elisha J. Campbell; that I saw my grandfather about every week up to the fall of 1903; that I stopped over night at his house frequently up to that time; that he always appeared to me to be all right; he talked rationally and intelligently ; he seemed to understand what he was talking about. He was weaker physically than he had been; he had more of a stoop and a slower gait than formerly; he did not talk so much as formerly. I never noticed any peculiarity of his conduct at any time up through the year 1903. At one time I went up there to my grandfather's to get a note and check signed. The note and check were payable to a Morris Herman, I think, of New York. They were filled out. My grandmother was in the room when they were signed. I never took a blank note or check up to him to be signed. That is the only note and check that I ever took up for him to sign."

We can not say that the testimony of this witness, as outlined in his affidavit, would have had no effect upon the jury, or that it might not have changed the result.

The claim by counsel for the appellee, urged at the trial below, that if Bradford Campbell contradicted the testimony of Rebecca Campbell, it would put them "in the position to bring her in at the twelfth hour and either make us go to the jury with an unfinished case, or ask your honor to take the deposition of Mrs. Rebecca Campbell," is unsound. Bradford

Campbell was called in rebuttal, and could only testify in rebuttal. If he denied the statements made by Rebecca Campbell, the appellee could not call her to reiterate her statements. As to his testifying in regard to the mental condition of James Campbell, we do not see how the appellee would have been injured thereby as a result of any reliance by his counsel on the agreement of counsel referred to. He had to meet the testimony of other witnesses upon that point, and we can not see that he was in any worse position as to Bradford Campbell, by reason of the agreement.

In any event, if necessary for the furtherance of justice, the court could have allowed the appellee such time to meet the testimony as the circumstances of the case demanded.

Our conclusion is that the ruling of the court refusing to permit Bradford Campbell to testify was erroneous. The exception thereto is sustained.

Our decision upon this exception renders a consideration of the other exceptions unnecessary.

Case remitted to the Superior Court for a new trial.

---

BLODGETT, J., dissenting. After verdict for the appellant in the sum of $3,024 upon his appeal from the Municipal Court of the city of Providence allowing a portion of his claim against the estate of his father, one James Campbell, deceased, for money alleged to have been loaned and services alleged to have been rendered to his said father, the appellant seeks a new trial, because of certain alleged errors in the trial, and also because he claims the amount of the verdict is inadequate, and because of newly discovered evidence.

The first exception which is now pressed was as to the ruling of the court in declining, on the last day of the trial, to allow one Bradford Campbell, a son of the appellant, to be sworn and testify, in violation of an agreement of counsel for the appellant, made in open court at the close of the preceding day, that he would call only two witnesses, whose names he gave in open court to the opposing counsel, and to whom the court then said that the appellees need be prepared, on the following day,

to meet only the testimony of these two witnesses, and who thereupon came to court the following day prepared only with testimony to rebut the aforesaid witnesses. In support of the exception, the appellant's counsel contends that the presiding justice required him to elect, shortly before the usual hour of adjournment on the preceding day, and when he had no other witnesses in court, either to inform the court of the number of witnesses he should call the following day, or in default of so doing the court would then proceed with the trial of the case. The reason given for this requirement by the court was that, inasmuch as the trial had already lasted for several days, and a large number of witnesses had testified, the court deemed it important, if possible, to conclude the trial before the Christmas recess, then close at hand, in order that the jury might not be obliged to wait until after that recess for the completion of the testimony upon which they were to base their verdict. It is claimed by the appellant that this action on the part of the trial justice was beyond his power, and that any agreement of counsel so made was an agreement made under duress, and not binding. To this contention it is sufficient to reply that if counsel desired to raise that question here, counsel should then and there have declined to comply with such a requirement, and should then and there have excepted thereto. This he did not do; but the record discloses the following colloquy between counsel and court relative to this matter (p. 603): "MR. WATERMAN—In order to expedite the matter, if your honor please—of course, I will state that I didn't know the court was going to sit overtime to-night, and I thought we had enough testimony to fill up the time until adjournment, and did not like to ask business men, who would not be needed to-day, to come twice. In order to expedite the matter, I will agree to put on simply those that I know about—Mr. Collins and Mr. Hawkins. They will both testify as to his (James Campbell's) condition.

"BY THE COURT—Now, then, gentlemen on the other side, you understand what you have to meet, and I shall expect you to go on with your case, too, as soon as they have finished

theirs.   On that condition, we will stop now till half-past nine to-morrow morning."

On the following morning, the last day of the trial, the appellant's counsel called as a witness one Bradford Campbell, a son of the appellant, and then living with his father, and thereupon the record discloses the following (p. 610):

"MR. WATERMAN—Mr. Bradford Campbell.

"MR. CHAMPLIN—I shall have to object to the testimony of this witness.   Mr Waterman made an agreement with us and with the court last night, and I shall insist that that agreement be kept.

"MR. WATERMAN—Now, if your honor please, at that time I said there might be one thing that I had overlooked in the testimony, in the haste of closing up.   There is one thing that I have overlooked, and that is the statement of Mrs. Rebecca Campbell, as to Mr. Bradford Campbell coming up at one time and getting the signature to a note, and that is what I want to examine him about.   I will limit my examination to that, although I would like to examine him as to Mr. James Campbell's condition during the time mentioned.   We didn't have him here yesterday because, as I said, I thought we had enough witnesses to fill the day up, and we did not go to undue expense to get him in.

"MR. CHAMPLIN—This man is a son of Elisha J. Campbell, lives with him, and they could have had him here any time they chose.   Last night your honor told Mr. Waterman that unless he would name the witnesses, you would go ahead on this case last night, and you waited for him to name the witnesses.   He insisted that he would put on whatever witnesses he could get.   Your honor told him then you would go ahead with the trial last night unless he would name them, and you would hold him strictly to the agreement.   He finally said that he would name three persons, and then eventually he got up and said he would take one of those persons out, and he would put on only those two persons, and he named those two persons.   With that information we had from him, and with your honor's statement that you would hold him strictly to his agreement, we have made no preparation whatever to meet anything except

the testimony of those two witnesses.  We are not bound, under that agreement and under the ruling of your honor, to meet the testimony of this witness.  He is going to contradict, perhaps, the testimony of Mrs. Rebecca Campbell.  Mrs. Rebecca Campbell's deposition is in here.  It would put us in the position to bring her in at the twelfth hour, and either make us go to the jury with an unfinished case, or ask your honor to take the deposition of Mrs. Rebecca Campbell.

"BY THE COURT—I shall hold you to your agreement, Mr. Waterman.

"MR. WATERMAN—Will your honor note my exception?

"BY THE COURT—I note your exception."

I am of the opinion that the exception to the action of the trial justice should be overruled.  In so holding, it is not necessary to decide that it is within the power of the trial justice to arbitrarily limit, in all cases, the number of witnesses which either party may in good faith call—but that is not this case, and this decision rests on the facts disclosed in the case now at bar.  Here, after some discussion with the court, an agreement was made in behalf of the appellant, in open court, in the presence of the parties, upon which the court instructed the other party to rely, and upon which the record shows that they did rely.  Section 483, C. P. A., is as follows:  "Exceptions to rulings, directions, and decisions made during a hearing in a cause heard by the court without a jury or during a trial by a jury shall be taken immediately."  In the case at bar, not only was there no exception taken to the requirement of the court, at the time it was made, as required by statute, but counsel expressly announced, in open court, an unqualified assent to this requirement of the court in the presence of the appellant; and this agreement must be held to be an estoppel, in law, as well as in morals, and to be a waiver of any ground of exception thereto, in view of the consequent instruction of the court to the opposing counsel and their reliance thereon and resulting action.

In *Bank* v. *American Tract Society*, 4 Sandf. Ch. 438, 468, it was held as follows:  "The defendant's declarations on that occasion, were intended to have weight with the court, on the

pending motion. They were a solemn statement, equivalent to a promise or engagement, made to the court and the adverse party, that the latter might if they would, avail themselves of the light and air, over the open space left in the rear of the defendants' Spruce street lot; and that such space had been left for the mutual accommodation of both parties in respect of light and air.

"I have no reason to doubt that the statement was made in entire good faith. It will not answer for the defendants to assert now, that their counsel were not authorized to make such a statement or engagement, after permitting it to go before the court, not merely undisputed and unquestioned by their executive officer who was present, but actually sustained and warranted, to all appearance, by the defendants' answer in the cause, and the diagram annexed.

"They have been induced to deviate from the undertaking then made, and their ground for so doing, as stated by them, is their apprehension of danger to their own building and its contents, from any fire which may occur in the complainants store. . . . Whether this apprehension be well or ill founded, it is not for me to say: nor do I deem it material.

"In my view, the statements and representations made to the court and to the complainants, on the argument of the former motion, are to be regarded *as a contract* with the court, as well as the latter; and that it stands on the same footing as any stipulation or engagement made by a party, in *facie curiæ*, touching the subject matter of the litigation, which the court is bound to enforce. It should be carried into effect, precisely as the court would enforce a promise of a party that he would not commit waste on mortgaged premises, made pending a motion for an injunction or receiver."

The majority opinion relies upon certain cases, in other jurisdictions, in support of the decision that the exception taken to the action of the trial court in this behalf sets forth reversible error, and it is therefore appropriate to examine them at some length in order to arrive at a determination as to their value and authority as precedents. First, conceding the general proposition that "It is well settled that the trial court in the

exercise of a sound and reasonable discretion, may limit the number of witnesses on a given point," it is then sought to qualify and limit that concession by a distinction which appears to me to be inconsistent with it, as follows: "A distinction has, however, been made where the fact to be established is not sworn to directly by witnesses, but must be established by proof of other facts from which the existence or non-existence of the fact in controversy may be inferred." I am unable to concur in the conclusion reached by the majority of the court in this respect. It is important to keep in mind that in this proceeding the main issue was whether Elisha Campbell was a creditor of his father's estate; and if so, in what amount; the issue of the mental competency of James Campbell at the time of the execution of a certain note which constituted a part of the appellant's claim was pertinent, but the real issue as to that item was as to the consideration of the note.

*Green* v. *Phœnix Mut. Life Ins. Co.*, 134 Ill. 310 (1890), cited in the majority opinion, appears to be overruled by the later case of *Illinois Central R. R. Co.* v *Treat*, 179 Ill. 576 (1899), in which the judgment of the trial court was affirmed, and in which it appears, from the dissenting opinion of Boggs, J. (who cites the *Green* case), on p. 587, as follows: "Under this ruling of the court at least three witnesses whose testimony the appellant company desired to produce were excluded from the witness stand. This I think was error." . . : (p. 589) "In the case at bar the point to which the testimony of the excluded witnesses was directed was controverted, and it was the right of appellant to lay before the jury all competent testimony it had which tended to meet and deny the charge it had negligently failed to supply a sufficient number of officers, agents, or guards to protect the public upon the platform. The exclusion of witnesses produced for the purpose of showing the number of persons so employed and so stationed on the platform on the occasion in question, was, it seems, clearly wrong and so prejudicial as to constitute error reversible in character." But the majority of the court, in an opinion written by Carter, C. J., held that "The judgment must be affirmed." Mr. Wigmore, in his recent work on Evidence (vol.

3, § 1908 (3) ), in speaking of the powers of the court to limit
the number of witnesses, says: "For witnesses upon *any
point* whatever a similar rule of limitation may be enforced.
. . . A court occasionally (in foot note e. g. Ill. and Mass.)
declares the rule applicable only where the fact is not actually
controverted. But this limitation is unsound, because the
value of merely cumulative witnesses may become trifling even
where the point is controverted and the policy of the rule rests
on the proportion between the probative value of the additional
witnesses and the disadvantages they bring;" and in com-
menting on the *Green* case, *supra,* he says that the limitation
of the number was there held improper "partly because the
order was not made at the opening of the trial and partly be-
cause the issue was the main one in dispute," adding, p. 2526:
"Moreover, the intimation in *Green* v. *Ins. Co.,* Ill., that the
notice must be given at the opening of the trial is unjust and
impracticable as a general rule." Mr. Wigmore further says:
"Sometimes a court declares the qualification that the limiting
of numbers is proper only upon collateral issues; though there
is little authority for this," and cites as the only instance of such
"little authority" the *Green* case in question. In view of this
later decision of the Supreme Court of Illinois, it is not neces-
sary to further consider the cases from the inferior courts of
that State, or the earlier decisions referred to in the majority
opinion, of which there are five more.

As to the citations that when the issue is as to sanity at a
given time, a different rule prevails.

The case of *Galveston, etc., R. Co.* v. *Matula,* 79 Tex. 577
(1891), is cited in the majority opinion. This was an action
for the recovery of damages for causing the death of plaintiff's
wife by a collision between a train and a wagon in which appellee
and his wife were at a public crossing on the railway. The
court refused to admit the depositions of two witnesses (five
having testified on similar issues). It appears (p. 580) that
"the evidence related to facts bearing on plaintiff's ability
to have seen the approaching train from where he was long
before it reached the crossing, and to some other matters about
which there was some conflict of testimony." So far from

arising in a case in which mental competency was in issue, or laying down a rule for guidance in that respect in that class of cases, the citation relied on in the majority opinion is the direct authority to the contrary, as appears in the later case of *Delgado* v. *Gonzales*, 28 S. W. Rep. 459, decided in 1894, in which it was held by the Court of Civil Appeals of Texas, and which was a will contest, as follows: "Upon the trial of the cause, appellee, without objection, introduced the will, the written proofs used in the county court for probating it, and then rested his case. Appellants then introduced quite a number of witnesses to show that the mind of the testator was in such condition that he was incapable of rationally disposing of his property. After appellants closed, a number of witnesses were introduced by appellee who swore to the sanity of the testator. Appellants then desired to introduce other witnesses as to testator's state of mind. This was not permitted by the court and the action is assigned as error. The testimony offered was only a reiteration of testimony already introduced, and it was within the discretion of the trial judge to exclude further testimony on the same subject. If cumulative testimony can be urged as being in rebuttal, a trial might become interminable, and the contest would be narrowed down to a question of the number of witnesses that could be introduced. 'There must exist in every court the power to determine when evidence purely cumulative shall cease, or there would be no limit to trial; and the exercise of such discretion would be no ground for reversal of a judgment unless it was made to appear that this had been abused.' *Galveston, etc., R. Co.* v. *Matula*, 79 Tex. 577, 15 S. W. 573. There is nothing offered to show that the discretion invested in the trial judge was abused in this case. There was a great conflict in the testimony on the question of the sanity of the testator, but the jury have determined the conflict in favor of appellee, and we are not disposed to disturb their verdict."

In *Fraser* v. *Jennison*, 42 Mich. 206, which was a will contest in which testamentary capacity was one of the issues, it was held by Judge Cooley (p. 223): "The court was quite justified in declining to permit Dr. Johnson to be called as an expert

by the contestants after five other experts had been called and examined on their behalf. If testamentary cases are ever to be brought to a conclusion, there must be some limit to the reception of expert evidence, and that which was fixed in this case was quite liberal enough. To obtain such evidence is expensive, since desirable witnesses are not to be found in every community; but an army may be had if the court will consent to their examination; and if legal controversies are to be determined by the preponderance of voices, wealth, in all litigation in which expert evidence is important, may prevail almost of course. But one familiar with such litigation can but know that for the purposes of justice the examination of two conscientious and intelligent experts on a side is commonly better than to call more. And certainly when five on each side have been examined the limit of reasonable liberality has in most cases been reached. The jury cannot be aided by going farther. Little discrepancies that must be found in the testimony of those even who in the main agree, begin to attract attention and occupy the mind, until at last jurors, with their minds on unimportant variances, come to think that expert evidence, from its very uncertainty, is worthless. This is not a desirable state of things, and it can only be avoided by confining the use of expert evidence within reasonable bounds."

*Ward* v. *Dick*, 45 Conn. 235, is cited in support of the contention that in an action for slander it is error to limit the number of witnesses as to plaintiff's character and reputation. The decision is directly opposed by the case of *Bissell* v. *Cornell*, 24 Wendell, 354, in which the Supreme Court of New York, in an action of slander charging plaintiff with having had criminal connection with a certain woman, and having assisted her in procuring an abortion, sustained the verdict for the plaintiff when the trial court had refused to allow defendant to call more witnesses in impeachment of the plaintiff's character than the plaintiff called in support of his character, saying (p. 357): "We have heretofore held that the judge at circuit may exercise a sound discretion as to the number to be sworn of impeaching and supporting witnessses. There must be some limit. Anyone familiar with trials must be aware that after

some dozen of witnesses on a side have been examined, equally supporting and impeaching a party or witness, very little additional benefit is derived by enlarging the number. The relative strength of the testimony will be the same, however extended the examination. A balanced public opinion will appear."

To fully understand the reference to *Pritchard* v. *Henderson*, 3 Penn. (Del.) 128, it should be stated that this was a ruling made orally in a jury trial in an action of ejectment held in the Superior Court. It is not a decision of the Supreme Court of Delaware, which does not appear ever to have passed upon the point in question.

In like manner *Nelson* v. *Wallace*, 57 Mo. App. 397, is a decision of an inferior court and is not the decision of the Supreme Court of Missouri. While holding in *St. Louis R. Co.* v *Aubuchon*, 199 Mo. 352, that a ruling limiting the number of witnesses in an action for the assessment of damages for land taken by a railroad for its right of way to four on each side was arbitrary and unreasonable, especially when not announced until one side had already called three witnesses and had but one choice remaining, and the other side had called none and had four choices remaining, to which ruling it appears: "Plaintiff excepted to the rule when announced and excepted to its application when made," the Supreme Court of Missouri has repeatedly sustained the action of the trial court in limiting the number of witnesses, even in criminal cases of the gravest nature, none of which are overruled in the decision *supra*.

Thus, in *State* v. *Lamb*, 141 Mo. 298, which was an indictment for robbery in which the defence was an alibi, the trial court refused to allow the defendant to call more than six witnesses to establish the alibi, and the Supreme Court of Missouri held as follows (p. 304): "As to the charge that the court excluded competent evidence on the part of the defendant, the only ground for that charge consists in these circumstances: six witnesses besides defendant having testified that defendant was at the free silver parade and tending to show that defendant did not participate in the robbery, 'whereupon the

defendant by his attorney produced several additional witnesses in court and requested that they be sworn and permitted to testify, and stated that they would testify that on the night of the alleged robbery the defendant, Thomas Lamb, was present at the place of meeting of persons and clubs to participate in the Democratic parade, and was in said parade from the time that it started from Twelfth and Market streets, about 9 o'clock, until it disbanded, in the neighborhood of 12 o'clock, and that from about half-past eight until 12 o'clock on the night of the alleged robbery, the defendant was in their company and presence and he was not during that time at the place of the alleged robbery.'

''But the court refused to hear any more witnesses on the subject of alibi. How fully and with what degree of particularity the seven witnesses testified as to an alibi for defendant, does not appear, their testimony being taken down in short form. Now if they testified as fully as was proposed the non-testifying witnesses would testify, we are not prepared to say as a matter of law that the court erred in refusing permission to other witnesses to testify on the question of alibi. A court has some discretion in these matters, and may limit the number of witnesses on a particular point, and unless an abuse of such discretion appears, no reversible error has been committed. 2 Elliott's Gen. Prac. sec. 564, and cases cited; *State* v. *Whitten*, 68 Mo. loc. cit. 92.''

In *State* v. *Smith*, 164 Mo. 567, which was an indictment for murder in which the defense was self-defence, it appears (p. 582): "The record disclosed that after defendant had introduced and examined eight different witnesses with respect to threats made by Watson against him, some of which were communicated to him and others that were not, the court refused to allow the defendant to introduce any further testimony on the subject of threats, to which ruling defendant excepted," and the Supreme Court of Missouri held (p. 583): "But it does not necessarily follow, we think, under the facts disclosed by the record, that the judgment should be reversed because of the refusal of this court to hear evidence with respect to other and additional threats made by deceased against

defendant, after having heard evidence by so many witnesses, at least eight, in regard to the same subject-matter, though made at different times. There must be a limit to such inquiries somewhere in the course of a criminal trial in order to avoid unnecessary consumption of the time of the court, and it does seem to us that it had been reached at the time the court announced that it would hear no more evidence in regard to threats. Especially when threats of violence by deceased against defendant at different times and places had already been abundantly proven. It was not, therefore, prejudicial to defendant, nor an abuse of its discretion, for the court to refuse to hear still further evidence on the same subject. While it would have been better for the court to have heard the evidence, the judgment should not, under the circumstances, be reversed for its failure to do so."

In *Fisher* v. *Conway*, 21 Kas. 18 (1878), also cited in the majority opinion, the plaintiff sued eleven defendants for an alleged trespass, and the court below refused to hear more than four of them; and it was held by Brewer, J. (p. 24): "Again, it is claimed that the court erred in limiting the number of witnesses on the part of the defense. After four witnesses had testified on the part of the defense to the circumstances of the entry upon the premises, the difficulty with Mrs. Conway, and the threshing, the court refused to permit any further witnesses upon these matters. In this, we think the court erred. It is doubtless true as to any collateral matter, as the impeachment of a witness, that the court may restrict the number of witnesses, and unless it appears that there had been an abuse of discretion in that respect, no error will lie. (*Anthony* v. *Smith*, 4 Bos. 503.) Perhaps, also, the court may have to some extent a like power, even where the testimony runs to the matter principally and directly in dispute; though see upon this, *Hubble* v. *Osborn*, 31 Ind. 249; *White* v. *Hermann*, 51 Ill. 243. But still it may not prevent any defendant against whom a recovery is sought from being heard upon the witness stand as to what he knows of the matters charged against him. Here, the plaintiff sued eleven parties for an alleged trespass. They denied the trespass. That was a denial good for each

of them, and each one had a right to tell the jury what he saw and knew of the transaction. The rights of no one defendant were greater than those of any other; and the court could not compel them to select which of their number should be witnesses and which should not, or, as appears to have been done, after some had testified, forbid the rest from the witness stand." The decision is thus based upon the exclusion of the defendants in the action, and rests upon a different principle than the case at bar, and is undoubtedly a correct decision. But in the later case of *State* v. *Commissioners of Pratt Co.*, 42 Kas. 641 (1889), also cited in the majority opinion, in which an injunction was sought to restrain certain county commissioners from completing a purchase of certain lands for a county poor farm, it is said (p. 648): "It is further claimed that the purchase of the land was void for the reason that the land was not worth the amount which the commissioners agreed to pay for it. . . . In this connection the plaintiff in error also claims that the court below erred in limiting the number of witnesses to prove the value of the land, to six on each side. Under the circumstances of this case, however, we think the court below certainly did not err. . . . Under the circumstances of the case we think that the limitation imposed by the court as to the number of witnesses was very reasonable."

In *Barhyte* v. *Summers*, 68 Mich. 341 (1888), cited in the majority opinion, which was an action of deceit in the sale of a horse known to be unsound, the trial court limited the number of witnesses as to the condition of the horse, as to soundness prior to the sale and it was held to be error. The decision was contrary to the previous decisions of that court. Thus in *Riggs* v. *Sterling*, 60 Mich. 643, at p. 655, the court says: "The value of this homestead was really the only question to be determined in this case. Six witnesses on each side were allowed to testify upon the subject, and no more. The refusal to allow more to testify on the part of the plaintiff is assigned as error; but we think there was no abuse of discretion on the part of the court in not allowing more cumulative evidence upon this point."

And in the later case of *Detroit City Railway* v. *Mills*, 85

Mich. 634, 659 (1891), the court held: "It is insisted that the court was in error in excluding testimony as to the dangers and actual perils witnessed by persons from the use of the new method of transit for the reason that this testimony had a bearing upon the interference with the customary use of the street. This question arose three times upon the hearing. On the first two occasions the testimony ruled out referred entirely to the tendency of these cars to frighten horses. The court made its third ruling at the close of the testimony of one Mrs. Rascher, who had testified to the decrease of travel upon the street, to the frightening of horses and the decrease in rents. The court then announced that eight or ten witnesses had testified to the condition of the road, and no more testimony would be allowed on that point. Defendant's counsel announced that they had a large number of witnesses to the same effect, and asked permission to call two or three more. The court said that five or six witnesses to any particular fact was sufficient, and that it was clearly within its discretion to limit the number of witnesses; that as to the points already covered defendants would not be permitted to call more witnesses, but as to any new facts they might call more. The circuit judge was clearly right in this exercise of this discretion."

Of the other cases cited in the majority opinion, *Anthony* v. *Smith*, 4 Bosw. 503 (N. Y.), is direct authority for the contention, not only that the number of witnesses may be limited, but that such action is not even ground for exception. The case was an action for damages for an assault, and the court held that (p. 508): "The court, in its discretion, may limit the party as to the number of witnesses to be examined as to what occurred, at a given time and place, between the parties. If he exercises his discretion to the actual prejudice of either party, his decision in that respect is not the subject of an exception which can be reviewed on an appeal from the judgment. . . . The exercise of that discretion is not the subject of an exception. If probable prejudice has resulted from it, in the trial of any cause, the remedy is a motion for a new trial, on a case."

*Nolton* v. *Moses*, 3 Barb. 31, also cited, is authority for the

same proposition. This case was an action for slander, and the Supreme Court of New York says: "The limitation of impeaching and sustaining witnesses to three on a side in this case, looks, to a person unacquainted with such trials, like depriving the parties of a right. But the surrounding circumstances would enable the judge at the circuit, to perceive whether any benefit would result from an increase of the number. . . . In the present case, I have no doubt the defendant suffered more from the attack he made upon the witnesses by general evidence, than from being restrained from repeating it. Be that as it may, we cannot interfere upon a bill of exceptions; and the motion for a new trial must be denied."

*Meier* v. *Morgan*, 82 Wis. 289, also cited in the majority opinion, is authority also for the contention that exception must be taken "when the original ruling is made," and not afterwards; and this position is re-enforced by the case therein cited. This case was an action to recover for personal injuries by the falling of a portion of an ice-house, and the court held that (p. 294): "During the trial, after the defendants had been examined as to the manner in which the ice was packed in the ice-house, the defendants called other witnesses to establish the fact that the ice was properly packed; and at the close of the testimony of the second witness the court ruled that he would only allow three more witnesses as to that particular fact, making eight witnesses in all, including the defendants themselves. No objection or exception was taken at the time to this ruling, but at a later stage of the trial, after the number allowed by the court had been examined, the defendants offered another witness on the point, and his testimony was ruled out, and defendants except. We think the proper time to take the exception was when the original ruling was made. The ruling seems to have been practically assented to when originally made; certainly it was without objection. *McConnell* v. *Osage*, 80 Iowa, 293. A reasonable limitation of the number of witnesses upon a single fact is within the discretion of the trial court."

And in *McConnell* v. *The City of Osage*, 80 Ia. 293, above

cited, which was an action for damages received from a defective sidewalk, the court says (p. 295): "The trial court limited the number of witnesses for each side to six on the question of the general condition of the walk where the plaintiff was injured, and the appellant complains of such action of the court. So far as we can judge, the order was made near the commencement of the trial, and without objection of either party. Later plaintiff desired to introduce additional witnesses, which the court refused. From the state of the record it does not appear that the question is properly before us for review, for we find no exceptions taken to the action of the court. If the order was made without objection, we must assume that the parties assented thereto; and of such action they could not afterwards complain."

I pass now to a consideration of other cases which sustain the contention that no error was committed by the trial court.

The power of a court to limit the number of witnesses to be called in an issue arising either in a civil or a criminal proceeding has been frequently upheld.

In *Outcault* v. *Johnston*, 9 Colo. App. 519, the trial court declined to hear more than four witnesses in surrebuttal of testimony impeaching the character of the defendant for truth and veracity, and it was held no error; the Supreme Court of Colorado saying: "It rests largely in the discretion of the court as to how many witnesses may be allowed to testify on a given point. If it were otherwise, the length of a trial could be protracted to an unreasonable and unwarrantable extent, and the time of the court consumed by the useless and unnecessary reiteration of testimony."

In *Butler* v. *State*, 97 Ind. 378, which was an indictment for murder, in which the number of depositions of witnessses from without the State was fixed by the trial court at forty-five, the Supreme Court of Indiana says (p. 386): "The court has a discretion as to the number of witnesses that may be called. This rule is recognized in the case of *Gardner* v. *State*, 4 Ind. 632. If the court had no discretion in such cases, then the case might be indefinitely delayed, and an unlimited number of witnesses called. But for this rule courts would be sub-

ject to the caprice of counsel, and public good would seriously suffer. We agree that this discretion should be so exercised as not to impair the rights of a defendant, nevertheless it does exist. But as the power is a discretionary one, an appellate court can only interfere where it has been abused." See also *Union Railroad Transfer and Stock-Yard Co.* v. *Moore,* 80 Ind. 458. And in *Mergentheim* v. *State,* 107 Ind. 567, which was an indictment for a public nuisance in polluting a canal, the court affirmed *Butler* v. *State, supra,* saying: "The court limited the parties to the examination of seven witnesses on each side in respect to the subject of the condition of the canal, and the odors emitted therefrom. A reasonable limitation is within the discretion of the court."

In *Kesee* v. *Chicago, etc., R. Co.,* 30 Ia. 78, at p. 80, the court limited the defence to two witnesses on a certain question, and refused to hear two others who were offered thereon, and the Supreme Court of Iowa held that: "A *nisi prius* court must be permitted to exercise a discretion as to the number of witnesses, the order and manner of their examination, etc., in cases before them, else examinations and trials might be indefinitely prolonged. In the absence of a manifest abuse of such discretion an appellate court ought not to interfere. No such abuse appears from this record."

In *Bays* v. *Herring,* 51 Ia. 286, 291, which was an action for malicious prosecution, the court says (p. 291): "The defendant asked to 'introduce further witnesses impeaching the general reputation of George W. Bays for truth and veracity.' To this the court said: 'Seven witnesses having already been examined on that point the application is denied.' The trial court must, of necessity, have the power, in the exercise of a legal discretion, to control the number of witnesses that should be examined to establish any fact. Otherwise trials might be prolonged to an alarming extent, and for the purpose of bringing about a mistrial by reason of the necessity that existed to adjourn the court. There is nothing in the record to indicate that the discretion with which the court is vested was abused. On the contrary it seems to us to have been wisely exercised."

In *Everett* v. *Union Pacific R. Co.*, 59 Ia. 243, these two cases above were affirmed upon the proposition that "the trial court had a legal discretion to limit the number of witnesses that might be examined to establish a single point or proposition." And see *Bays* v. *Hunt*, 60 Ia. 251.

In *State* v. *Beabout*, 100 Ia. 155, which was on indictment for rape, the trial court limited the defendant to five witnesses impeaching the State witnesses, and the court says (p. 160): "This ruling of the court is claimed to be erroneous. The power of the court to limit the number of witnesses upon a given point is not an open question in this state," and it was held there was no error.

In *Sixth Ave. R. R. Co.* v. *Metropolitan Elevated Ry. Co. et al.*, 138 N. Y. 550, it is said: "The questions in this case relate solely to the damages to the fee of the property owned by the plaintiff herein." (p. 553) "The limitation of the number of experts who should be called was matter of fair discretion with the trial court, and there is not the slightest trace in this record of any abuse of that discretion."

In *Powers* v. *McKenzie*, 90 Tenn. 167, the court say, as to the limitation of the number of witnesses as to the genuineness of handwriting: "It is further assigned as error that the Chancellor erred in limiting the number of experts to each side to five. Manifestly, a trial judge must have some control over the dispatch of business in his court, and some discretion respecting the number of witnesses he will hear upon a specific line of inquiry incident to a case. This conceded, it follows, from the essential nature of the juridical connection of inferior and appellate courts, that the latter will not reverse the ruling of the former, originating in the exercise of this discretion, unless it has been abused and it can be seen that this abuse has resulted in injury," and held no error had been committed.

In *Skeen* v. *Mooney*, 8 Utah, 157, which was an action for damages to land by diversion of water therefrom, it is said: "It also appears that the court limited the respective parties to three witnesses on either side of any point. This ruling of the court, the defendants now insist, was error. But they made no objection, nor did they take any exception, at the

time. If objection had been interposed, and exception taken, however, we would not be disposed to regard the ruling of the court as reversible error, in view of the facts of this case and of its nature."

In *Larson* v. *The City of Eau Claire*, 92 Wis. 86, which was an action to recover damages suffered because of a defective highway, the court said (p. 89): "The propriety of the ruling limiting the number of witnesses the defendant might examine as to the condition of the highway, which resulted in the exclusion of the testimony of Riley on that point, though not made until he was called, is not an open question in this court. A reasonable limitation of the number of witnesses upon a single question is within the discretion of the trial court. *Meier* v. *Morgan*, 82 Wis. 289; *McConnell* v. *Osage*, 80 Iowa, 293; *Bays* v. *Herring*, 51 Iowa, 286; Thompson, Trials, § 353. It is the better practice, no doubt, to impose the limitation at the commencement of the trial, or as soon as the necessity for it is reasonably apparent. In the present case the defendant had examined nine witnesses, a greater number than the plaintiff on the point in question. It cannot be admitted that, as a matter of right, the defendant might continue indefinitely to call and examine witnesses in respect to it. Perhaps a hundred or more might have been found competent to testify on the subject. It would be highly absurd to hold that the court was bound to sit and hear testimony of witnesses on this point, without limit of number. Certainly the court must possess a discretion to limit the party to a reasonable number. Whatever may have been held elsewhere on the subject, we see no good reason for changing the rule already established in this state. There is nothing to show any abuse of discretion on the part of the court."

In *Preston* v. *City of Cedar Rapids*, 95 Ia. 71, which was an action for damages to plaintiff's property by reason of change of grade of a street, the court say (pp. 73–75): "At the commencement of the trial, and upon its own motion, the court limited the number of witnesses touching the value of the property to seven upon each side. It is contended that this was error. The right of a trial court to limit the number of

witnesses who may be called to testify to a given point has been too often recognized by this court to be an open question. It was said in *Kesee* v. *Railroad Co.*, 30 Iowa, 80: 'A *nisi prius* court must be permitted to exercise a discretion as to the number of witnesses, the order and manner of their examination, etc., in the case before them, else examination, and trials might be indefinitely prolonged. In the absence of manifest abuse of such discretion, an appellate court ought not to interfere.' In *Bays* v. *Herring*, 51 Iowa, 291, 1 N. W. Rep. 558, we said, 'The trial court must, of necessity, have power, in the exercise of a legal discretion, to control the number of witnesses that should be examined to establish any fact.' *Everett* v. *Railroad Co.*, 59 Iowa, 244, 13 N. W. Rep. 109; *Bays* v. *Hunt*, 60 Iowa, 254, 14 N. W. Rep. 785. In *Minthon* v. *Lewis*, 78 Iowa, 622, 43 N. W. Rep. 465, we held that the court might limit the number of witnesses on any point in the case. See also, *McConnell* v. *City of Osage*, 80 Iowa, 293, 45 N. W. Rep. 550. Counsel for appellant called seven witnesses to testify to the value of the plaintiff's real estate before and after the change of grade in 1886. It appeared upon the examination of two of them that they had no such knowledge of the value of the property as qualified them to testify relating thereto. Whereupon, he proposed to call other witnesses to the same point and the court refused to hear them. It is claimed that the order limited the number of witnesses 'to give testimony on the damages and value to seven on a side,' and, as only five of the seven he had called did give such evidence, he was entitled, under the form of the order, to call two more. The order limited the number of witnesses upon the question of value of the property to seven on each side. Defendant was not prejudiced by the order. It knew before the case began that it was only entitled to call seven witnesses upon the question of values of the real estate. If two of its witnesses showed a lack of knowledge of values of the realty, and hence were not competent to testify thereto, that was no reason for setting aside or ignoring the order. It was defendant's business to know before it called its witnesses that they possessed the requisite knowledge to testify touch-

7

ing that matter.   It is urged that while this rule is proper, as applied to collateral issue, it should not be held applicable to the main issue in a case.   We discover no reason for limiting the application of the rule to a particular class of cases, or to certain issues.   The power thus given trial courts, when discreetly exercised, is alike applicable in all cases, and to all issues. The only question is, did the court, in this case, abuse its discretion?   We see no reason for so holding.   The preponderance of the evidence is not necessarily determined by the number of witnesses on each side who testify touching the same facts.   In our judgment, the court very properly exercised its discretion, and there was no error in refusing to hear additional witnesses offered by the defendant as to the value of the real estate."

In *Cushing* v. *Billings*, 2 Cush. 158, which was an action to recover the amount due on a promissory note in which both the genuineness of the signature and the consideration was in issue, it was said by Shaw, C. J. (p. 159):   "So, as to the number of witnesses, where the testimony may be extended almost indefinitely, as in the case of evidence to usage or character.   The case of handwriting is very similar, because, in regard to almost any man of business, hundreds of persons may be qualified, by having seen him write, to give an opinion which would be evidence.   In such a case, suppose a great number of witnesses to be called to prove the genuineness of a signature; and when as many of them have testified, as are necessary, in the opinion of the judge, to make a case, and court interferes and stops the further introduction of witnesses; if, then, as great or a greater number is called and introduced on the other side, to testify against the genuineness of the signature, the judge has a discretionary power to admit further witnesses to be called in its support.   The orderly course of proceeding requires, that the party, whose business it is to go forward, shall bring out the strength of his proof, in the first instance; but it is competent for the judge, according to the nature of the case, to allow a party who has closed his case to introduce further evidence.   This depends upon the circumstances of each particular case, and falls within the absolute

discretion of the judge, to be exercised or not as he may think proper.    Exceptions overruled."

In *Hollywood* v. *Reed*, 57 Mich. 234, which was an action to recover the amount claimed to be due the plaintiff as a physician, the court says (p. 237):  "In the forenoon of the second day of the trial the defendant had placed four witnesses upon the stand, who swore that the reputation of the plaintiff for truth was bad, and then rested his case.    The plaintiff then placed four witnesses upon the stand who supported the plaintiff's character for truth and veracity, and that they would believe him under oath.    Adjournment was then had for an hour and a'half for dinner, and upon the convening of the court, the plaintiff offered in evidence the enrolled decree for divorce, which, on objection, was excluded.    Another witness was then called in support of plaintiff's character for truth, after which it appears that the court requested the plaintiff's counsel to proceed, when he announced that there were several important witnesses almost at the door of the court-room, and asked the court to wait not over five minutes; that they had not expected this attempt at impeachment, and would not delay. The court inquired if his witnesses were in court.    Counsel replied: 'No; but I am informed that they are on the way, and almost at the door of the court-room.'    The court then said:  'I order the case to go on.'    Counsel for plaintiff then explained that he had no witnesses present.    Some further contention then arose between court and counsel, the court ordering counsel to go to the jury, and the counsel refusing to do so; and he thereupon called Henry Starkey as a witness, who testified in support of the plaintiff's character; and also two other witnesses to the same effect.    Plaintiff's counsel was then sworn as to the computation of interest.

"In looking at the contention between counsel and court it will be seen that the delay was asked to enable plaintiff to bring forward sustaining witnesses as to his character.    It had been attacked by four witnesses.    He had already introduced five witnesses to sustain it.    When impeaching testimony is given of general character for truth, the number of impeaching and sustaining witnesses which will be allowed to

be introduced is in the discretion of the court, and is generally limited to an equal number on each side. Here the plaintiff had already exceeded the number introduced by the defendant, who had given testimony tending to impeach the plaintiff's character for truth. There appears no reason, then, as the case stood when the court requested plaintiff's counsel to proceed, why he should not have sworn himself as a witness as to his computation of interest, and closed his case. Certainly it cannot be claimed that there was anything arbitrary or an abuse of discretion in ordering the case to proceed. The situation of the case did not justify plaintiff's counsel in insisting upon further delay. He did not claim that he had rebutting testimony other than that of a sustaining character, and therefore it resolved itself into the simple question under his request whether the court would delay the trial for the arrival of further witnesses of that kind. We think he was not obliged to do so."

In *Bunnell* v. *Butler*, 23 Conn. 65, which was an action on a promissory note, in the trial court "The defendant called witnessses to impeach the general character of Bunnell for truth. When the first impeaching witness was called, the court limited the number of such witnesses to six, upon each side. The defendant offered more, and claimed a right to examine them, but their testimony was not received." The Supreme Court of Errors of Connecticut held (p. 69): "In the next place, it is claimed that the court erred, in limiting the number of impeaching witnesses. This, however, was a matter within the discretion of the court. It would be absurd to hold, that, upon an enquiry of that sort, depending, in a great measure, upon the opinion of witnesses, a party has the right to examine as many as he pleases, and that the court and jury are bound to sit and hear them, without any power to interfere. There must necessarily be a limit to such enquiries, and it is for the court to prescribe it."

In *Hilliard* v. *Beattie*, 59 N. H. 462, which was an action for damages for an assault, the trial court limited the number of medical witnesses on each side to three, and the Supreme Court of New Hampshire says (p. 464): "The number of

witnesses called as experts may be limited by a special order, which should not be so modified as to give either party an unfair advantage."

In *Hupp* v. *Boring*, 8 Ohio Cir. Ct. 259, which was an action for the recovery of real estate in which the defence was adverse possession for more than twenty-one years, the facts were these (p. 259): "On the trial of the issue to a jury, the plaintiff examined a number of witnesses whose testimony tended to support the issue on her part, and rested her case. Thereupon the defendant called a number of witnesses, whose testimony tended to establish adverse possession in him for more than twenty-one years of the land in dispute, and was about to call a number of additional witnesses, 'as to the present condition of things along the line of the fence indicating whether the fence had been changed or not,' when the judge announced that he would limit the number to four on each side as to any such indications. The defendant called four and rested, the plaintiff then called four and offered to call the fifth and more to the same facts, but the court refused to permit further testimony to be given as to those facts, to which ruling the plaintiff excepted.

"It is conceded that the fact as to whether the fence had been moved within the twenty-one years, was material, and if found one way or the other, might determine the issue. The jury returned a verdict in favor of the defendant, upon which judgment was duly entered. To the order of the court limiting the number of the witnesses to four error is assigned," and the court held (pp. 260, 262): "It has long been held that in eliciting the truth from a witness, the manner and extent of the examination is largely in the discretion of the trial judge; but when it comes to the number to be called to establish a fact or a given issue, must all discretion be denied? A trial sometimes becomes a contest as to which side can overwhelm the other with the larger number of witnesses. And we have repeated what recently occurred in a common pleas court in this circuit, the issue between two neighboring farmers being the identity of three sheep, not worth to exceed fifteen dollars. A hundred witnesses were called, ten days consumed in the trial,

the three sheep were soon followed with the loss of the entire flocks of unfortunate farmers, and also a large part of their farms. In another part of this circuit the issue tried was the alleged warranty of a heifer at an auction sale of stock; all the men present at the sale were called by one or the other of the contending parties, with a result not less disastrous than the sheep case. A court of justice that has no power to regulate such exhibitions of bad temper, is hardly worthy of the name. . . We conclude that a reasonable limitation of the number of witnesses who may be called in proof of a fact, or of a single issue, is within the discretion of the trial court, to be exercised, no doubt, with caution, considering the nature of the case, the character of the witnesses, and the state of the proof." The judgment of the court was affirmed in 55 Ohio St. 635.

In *J. H. Clark Company* v. *Rice*, 127 Wis. 451, which was an action on a note given for a patent right in which the defence alleged that the patent was of no utility and that the plaintiff induced the defendant to give the note by false and fraudulent representations as to the practical utility of the patented device, the court say (p. 466): "Error is assigned for the rejection of testimony. We perceive no abuse of discretion in limiting the respective parties to fifteen witnesses on the question of the utility of the device covered by the patent."

In *Swope* v. *Seattle*, 36 Wash. 113, in which the plaintiffs sought an injunction against completing a change of grade of a street until damages therefor were paid, and in which damages were assessed, the Supreme Court of Washington says (p. 120): "The (trial) court refused to permit the respective parties to examine more than three real estate expert witnesses as to the value of the plaintiff's premises. That was a matter resting largely in the discretion of the court and we are not convinced that such discretion was abused, or that the plaintiffs were injuriously affected by the ruling of the court."

In *Austin* v. *Smith & Holliday Co.*, 109 N. W. Rep. 289, in which the number of witnesses had been limited to five by the trial court on a certain question, the Supreme Court of Iowa said: "The authority of the court to limit the number

of witnesses which may be called on any issue has been settled too long to require any discussion at this time." See also *White* v. *Boston*, 186 Mass. 65; *Sizer* v. *Burt*, 4 Denio, 426.

From these decisions in other jurisdictions it is evident that the right to limit the number of witnesses, as to any issue, main or collateral, in a case has frequently been exercised in cases involving the gravest crimes known to the law, as well as in equitable proceedings and other civil actions, and that it must affirmatively appear that injustice has been caused, in so doing, to constitute reversible error. That in some jurisdictions such action is not even a subject of exception, and in other jurisdictions the exception must be claimed when the order is made and not later. And there is substantial unanimity of authority that the number of witnesses as to matters of opinion such as genuineness of handwriting and mental competency may unquestionably be controlled by the court. And it is of this latter nature that the testimony of Bradford Campbell is composed, as appears by his affidavit. It was not properly offered in rebuttal of the alleged testimony of Rebecca Campbell that she had seen him carry away notes signed by his grandfather, James Campbell, for she distinctly states in cross-examination that she did not see his grandfather sign anything.

The testimony of Rebecca Campbell in that behalf is as follows (direct examination): "Q. 184. Do you remember at any time that Elisha sent his son to try to get one of those blank notes signed? A. Yes, sir, I do. Q. 185. What was done? A. For all I know he got his grandfather to go into the other room and sign something. I didn't see what it was, but the boy came here and had something signed. I said, 'What is the matter now?' He was kind of—(objected to.)" These were the final questions before the cross-examination of the witness, and make it perfectly plain that whatever was signed by her husband was signed in another room, and that she did not see what was signed. In cross-examination her lack of knowledge is made even clearer: "C. Q. 487. When was it that Bradford Campbell came up here? A. I could not tell you. It was—I know he came here one night, I went out,

I said, ' what are you doing now?' Brad said to me— C. Q. 488. Never mind what he said to you. About when was it that he came? A. I don't know what time he came. It was some time before he died. C. Q. 489. About when? A. I could not tell you. C. Q. 490. Can't you give me an idea about when it was? A. I can't. It might have been a year or two years. I guess it was a couple of years. C. Q. 491. Before he died? A. Yes. C. Q. 492. Might it have been more than two years before he died? A. I should think it was all of that. All the dates I have not got. C. Q. 493. What did he have? A. He said that his grandfather had signed some notes. C. Q. 494. Did you see what it was? A. No, I didn't see anything. Brad told me his grandfather had signed some notes, the signature was not right, and he wanted a good signature. That is that Brad told me. C. Q. 495. Did you see the notes? A. No. I did not. That is all I know, is what he said. C. Q. 496. Did you see the notes that your husband signed at that time? A. What notes did he sign? C. Q. 497. When Bradford came up here. A. No, I didn't see anything; but he said that it was some notes that his grandfather had signed, or some checks that he had signed, and the signatures was not right, and he wanted a good signature. C. Q. 498. You could have seen them? A. I didn't try to. C. Q. 499. You could have seen them if you wanted to? A. I suppose so. . . . C. Q. 504. Didn't you see whether this note, or whatever was signed at that time, was blank? A. I didn't see it at all. C. Q. 505. You could have if you wanted to? A. I suppose so." Both in her direct and in her cross-examination she expressly says she did not see what was done, so evidently knows nothing, of her own knowledge, in that respect. Thus no rebuttal was requisite, if, indeed, permissible.

The remaining purpose of Bradford Campbell's testimony is to show that in his opinion his grandfather was mentally competent at a certain time. On this point twelve witnesses had already testified for the appellant, including men who had known his grandfather long before the grandson was born, and only eleven for the appellees. It is not necessary here to determine whether the court would or would not have been

justified in limiting the appellant to two witnesses in rebuttal, since the trial justice did not do this, but on the contrary, imposing no limitation in number, he properly required counsel to keep the agreement then made with the court and opposing counsel, in the presence of his client.

It is said in the majority opinion that, "We think it is clear that the agreement was made under compulsion. The appellant's counsel was forced either to close his case in rebuttal then and there on the testimony which he had already put in, or name the witnesses whom he would call on the following day." I can not assent to such a definition of duress; nor is any authority referred to therefor, if, indeed, any such authority can be found. I fail to see that such a requirement, unlimited as to the number of witnesses which he might name, possesses the essential elements of duress.

No case has been cited by counsel, and an exhaustive personal examination, intended to cover every reported case in the United States on this subject, has disclosed no decision granting a new trial where counsel, when required to state the witnesses proposed to be offered, without the slightest limitation as to such number made by the court, instead of excepting at the time to the requirement of the court, unreservedly announce assent to the requirement in open court in the presence of the client, and, after having thus misled both the court and opposing counsel, on a later day repudiate the agreement thus solemnly made. If the requirement of the court was deemed to be beyond the power of the court, it was both the right and the duty of counsel to then and there respectfully urge that objection upon the court, and to then and there except to the ruling, and the question would thus be presented on the record and the rights of all parties preserved.

The refusal of this appellant's petition for a new trial, under § 472, C. P. A. in this case,. reported in 29 R. I. 428, was based by this court upon the following ground: "The conduct of the court complained of was subject to exception *to be taken immediately*, under C. P. A. § 483." This course I deem to be imperatively required by the mandatory provisions of § 483, C. P. A. I am unable to assent to the opinion of the ma-

jority of the court, which seems to me, not only to disregard our own decision, heretofore rendered in this case, and to nullify that statute, but also to renounce a power inherent in the court as well established by abundant authority, and which certainly weakens, if it does not entirely subvert, that requirement of good faith with the court which it is the constant duty of counsel to observe.

To the exception that the verdict is inadequate in amount, and, inasmuch as certain items of the appellant's claim were not allowed, is contrary to the weight of the evidence, it suffices to say that upon a careful examination of the conflicting evidence submitted to the jury, whose verdict has been approved by the trial justice in declining to grant a new trial on this ground, I am not willing to disturb the finding of the jury.

A new trial is also sought upon the ground of newly discovered evidence, and numerous affidavits relating to the mental competency, in his later years, of James Campbell, who admittedly died of paretic dementia, have been submitted. The same issue of mental incompetency was raised in the hearings before the commissioners appointed by the Municipal Court of the city of Providence, and the record of testimony there given was used by counsel for purposes of cross-examination at the trial in the Superior Court. Medical and other testimony upon the same issue was offered by both sides at this trial, and in effect the appellant's present contention is that he did not offer all the evidence he might have offered on that fact, for I see no reason he should suppose the issue would not be raised, and he should have prepared himself to meet it. Obviously, his contention, that he was entitled to suppose that a defence which seems to have been successfully interposed in the former hearing would be abandoned at this hearing, is untenable. All these affidavits relate only to the mental competency of James Campbell, and they were all obtained and filed between the rendering of the verdict on December 20, 1906, and January 11, 1907. Except for the statement that he was unable to procure this testimony "by the exercise of reasonable care," the case presented by them is not dis-

similar to the case of *Riley* v. *Shannon*, 19 R. I. 504: "He apparently seeks to excuse his failure to present the testimony on the ground that, the plea filed being the general issue, he had no notice of the evidence and was surprised by the defendant's testimony. If surprised, he should have asked for a continuance, that he might have had an opportunity to procure the additional testimony, if he deemed it important. This he did not do. Having gone on with the hearing and taken the chances of a decision, it is too late after an adverse decision to ask for a new trial for the purpose of putting in additional testimony."

In my opinion the appellant's exceptions should be overruled and the case remitted to the Superior Court with direction to enter judgment on the verdict.

*Greeen, Hinckley, and Allen,* for appellant.
*James Harris and Irving Champlin,* for appellees.