STATE

v.

**Ralph BYRNES et al.**

**No. 79–412–C.A.**

Supreme Court of Rhode Island.

July 31, 1981.

---

John A. Murphy, Providence, for plaintiff.

John F. Cicilline, Providence, and William M. Kunstler, New York City, for defendant Ouimette.

John F. Sheehan, Providence, for defendant Byrnes.

Peter DiBiase, Providence, for defendant Flynn.

## OPINION

MURRAY, Justice.

On the morning of August 14, 1975, nine masked men entered the Bonded Vault Co. (hereinafter Bonded Vault), a commercial safe-deposit company located in Providence. After allegedly robbing several Bonded Vault employees at gunpoint, the masked men proceeded to break into 146 of the 148 safe-deposit boxes located in the vault. They garnered approximately $4 million in cash and valuables from the robbery of the guards and the entry into the deposit boxes.

One of the alleged participants in the break, Robert J. Dussault (Dussault), who testified at great length for the state, was arrested in early January 1976 in Las Vegas, Nevada. Upon his return to Rhode Island he made statements to Providence police and Rhode Island State Police implicating himself and several others in the robbery of Bonded Vault. Among those inculpated by Dussault were defendants Ralph Byrnes (Byrnes), Charles Flynn (Flynn), and John Ouimette (Ouimette), all of whom were later arrested in Rhode Island. Three other suspects were also arrested and charged with defendants.

Following a trial by a Superior Court jury, defendants Byrnes, Flynn, and Ouimette were convicted of various crimes arising out of their alleged activity on August 14, 1975. The defendants Flynn and Byrnes

were convicted on four counts of robbery,[1] five counts of kidnapping,[2] and one count each of entry into a building with intent to rob,[3] possession of burglar tools,[4] possession of a pistol while committing a crime of violence,[5] and conspiracy.[6] The defendant Flynn also was convicted on one of unlawful possession of firearms,[7] and one count of assault with a dangerous weapon.[8] The defendant John Ouimette was convicted of one count of conspiracy and one count of aiding and abetting.[9] The three other suspects who were charged with defendants were found not guilty on all charges against them. The defendants timely perfected their appeal to this court.

The defendants in their appeal raise eight procedural and evidentiary issues. We shall advert to additional facts as they become necessary with respect to the various issues raised in this appeal.

## I

On April 12, 1976, jury selection in this case began in the Superior Court. On that date counsel for defendants Byrnes, Flynn, and Tarzian requested the trial justice to exclude four armed, uniformed state troopers from the courtroom. This request was denied and the defendants objected. After a subsequent denial of defendants' oral motion for reconsideration of the trial justice's decision on this issue, counsel petitioned this court for a writ of certiorari. In *State v. Byrnes*, 116 R.I. 923, 355 A.2d 411 (1976), this court denied the petition. On April 27, 1976, we vacated our earlier denial of certiorari and issued an order requiring the trial justice to reconsider his ruling and to make a personal determination as to the

propriety of the presence of the state troopers during the trial. *State v. Byrnes*, 116 R.I. 925, 357 A.2d 448 (1976).

Subsequent to our remand, two witnesses appeared before the trial justice. One was Robert N. Mellucci, the Chief of the Department of Corrections Committing Squad; the other was Major Lionel J. Benjamin, Executive Officer of the Rhode Island State Police. The committing squad (now known as the Rhode Island State Marshals) is charged with the responsibility of maintaining the custody of prisoners while they are in the various courthouses or while they are being transported to and from the Adult Correctional Institutions.

Chief Mellucci made it quite clear that his squad was unable to satisfy the manpower demands being made upon it in April of 1976, at the time the so-called Bonded Vault case came on for trial. He informed the trial justice that in no way could the squad's eleven members service five different courtrooms. The squad's standard operating procedure called for two squad members for each prisoner being escorted into a courtroom. Six of the available eleven were slated for duty in Justice Francis J. Fazzano's courtroom. Four others were needed in a courtroom in which Justice William M. Mackenzie was presiding. Chief Mellucci testified that he presented his problem to Justice Fazzano, who in April of 1976 was in charge of the criminal calendar, and it was Justice Fazzano who contacted the State Police Department and sought its help in assisting the committing squad to discharge its obligation.

1. In violation of G.L. 1956 (1969 Reenactment) § 11–39–1.

2. In violation of G.L. 1956 (1969 Reenactment) § 11–26–1.

3. In violation of G.L. 1956 (1969 Reenactment) § 11–8–3.

4. In violation of G.L. 1956 (1969 Reenactment) § 11–8–7.

5. In violation of G.L. 1956 (1969 Reenactment) § 11–47–3.

6. In violation of G.L. 1956 (1969 Reenactment) § 11–1–1.

7. In violation of G.L. 1956 (1969 Reenactment) § 11–47–8, as amended by P.L. 1975, ch. 278, § 1.

8. In violation of G.L. 1956 (1969 Reenactment) § 11–5–2.

9. In violation of G.L. 1956 (1969 Reenactment) § 11–1–3.

In his testimony, Major Benjamin disclosed that upon receiving the request for help, the State Police agreed to act "strictly as a backup" for the committing squad and that the detail's duty was to make sure that those people who were coming into the Bonded Vault courtroom did not pose a threat to the judge, the attorneys, or the defendants. He also explained that the State Police was unionized and that its collective-bargaining agreement stipulated that details such as the courtroom security were to be assigned to the uniformed, rather than the detective division. The Major also informed the trial justice that, even if there were no contractual obligations, the detective division's manpower supply was such that there was no one available for a courthouse assignment. He testified that departmental regulations require that all uniformed troopers carry their weapons in their exposed holsters at all times, or, as Major Benjamin said, a "trooper never takes his weapon off anywhere."

The trial justice, in denying the motion to exclude the uniformed troopers from the courtroom, alluded to the committing squad's shortage and the State Police policy insofar as its uniformed personnel were concerned. He then addressed the issue of whether the presence of the troopers actually posed a threat to defendants' right to a fair trial.

In making his determination, the trial justice first pointed out that during the jury-selection process over 199 prospective jurors were interrogated. Many of that number had been excused before the presence of the troopers had been brought to their attention. The trial justice noted that of the fifty-four prospective jurors who were asked about the trooper, fifty-one said that the troopers' presence created no inference of guilt. The other three did not answer the inquiry directly, but two reported that they became "nervous" upon seeing a trooper in uniform. When the potential jurors were asked if they had any idea as to

why the troopers were in court, the answers ranged from "didn't know" to "security" to "protection." Those who chose "protection" indicated that the protection was for everybody, including the defendants.

After considering the evidence adduced at the exclusion hearing, the trial justice observed, "I am firmly convinced * * * especially with respect to the jurors we have in this box," that the presence of the armed, uniformed troopers "in this courtroom, has no effect whatsoever upon the constitutional rights of these defendants."

■ The handling of an extraordinary event which may arise during the trial, we have said, is a matter left to the sound discretion of the trial justice, and the manner in which he resolves the episode will not be disturbed by us absent a finding that he has abused his discretion. *Webbier v. Thoroughbred Racing Protective Bureau, Inc.*, 105 R.I. 605, 254 A.2d 285 (1969). Here, the trial justice gave a reasoned and careful consideration of the issues raised by the presence of the uniformed troopers and, after consideration of all relevant factors, found that the presence of the troopers in no way prejudiced defendants. We have reviewed the record, and we find no reason whatsoever to fault his conclusion.

## II

■ The defendants' second claim of error involves Rule 26.2 of the Superior Court Rules of Criminal Procedure.[10] In essence, this proviso states that before any evidence is offered at trial, the prosecutor may make an opening statement, and if the defense wishes to make an opening statement, it may do so just prior to the prosecution's introduction of testimony or just before beginning the presentation of evidence in support of the defense. Here, immediately after the prosecutor had made his opening statement, the defense made it clear that it wished at that moment to make an opening

---

10. Rule 26.2 of Super.R.Crim.P. provides:
"Before any evidence is offered at trial, the State may make an opening statement. If a defendant chooses to make an opening statement, he may do so just prior to the introduction of evidence by the State, or just prior to presenting his case."

statement. In the statement, the jury was to be told that in considering the testimony of witnesses just alluded to by the prosecutor, the jury should pay attention to such factors as the witnesses' demeanor, their prior criminal involvement, their explanation about particular aspects of evidence which might be developed on cross-examination, and the reasons for any inconsistencies in their testimony. The trial justice, after hearing this explanation, denied the request for an opening statement, pointing out that such commentary could be offered in final argument. The defendants described the trial justice's action as a denial of a basic right. We think otherwise.

■ The proper function of an opening statement is to apprise the jury with reasonable succinctness what the issues are in the case that is about to be heard and what evidence the prosecution and the defense expect to produce at trial in support of their respective positions. *United States v. Breedlove*, 576 F.2d 57 (5th Cir. 1978); *Blackwell v. State*, 278 Md. 466, 365 A.2d 545 (1976); *State v. Martinez*, Mont., 613 P.2d 974 (1980); *ABA Standards of Criminal Justice, The Defense Function*, § 4–7.4 (2d ed. 1980).

Recently, in rejecting an argument almost identical to that being pursued by the defense, the Delaware Supreme Court, after noting the purpose of an opening statement, emphasized that such a statement should not be permitted " 'to become an argument on the case, or an instruction as to the law of the case.' " *Holmes v. State*, Del., 422 A.2d 338, 340 (1980). Here, we are not confronted with a total prohibition but with a limitation as to the scope of the opening statement. The trial justice's actions were similar to those taken in *State v. Griffith*, 97 Idaho 52, 56, 539 P.2d 604, 608 (1975), where, in sustaining a limitation as to the extent of a defendant's opening statement, the court observed that an opening statement is not an appropriate vehicle in which to "attempt to impeach or otherwise argue the merits of evidence that the opposing side has or will present." The reasoning of the trial justice in rejecting

the defense's proposed opening statement was sound and will not be disturbed. Parenthetically, we would point out that on July 12, 1976, when the defense was about to begin its presentation of evidence, counsel for each of the appellants made an opening statement.

### III

There were two identifications of defendant Flynn. Barbara Oliva (Oliva), one of the prosecutor's witnesses, identified Flynn at his bail hearing; however, the trial justice found this identification to have been conducted in violation of defendant's Sixth Amendment right to effective assistance of counsel. Oliva also made an in-court identification of Flynn, which the trial justice allowed to stand because he found that this identification rested upon a source independent of the unconstitutionally tainted pretrial identification. Specifically, the trial justice found that Oliva's in-court identification of Flynn was based solely upon her observations at the time of the robbery. The defendants contend that the trial court erred in denying their motions to suppress the in-court identification of defendant Flynn by witness Oliva.

In *State v. Beaulieu*, 110 R.I. 113, 290 A.2d 850 (1972), we observed that the trial justice had carefully observed the requirement set forth in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), that once a pretrial identification had been found constitutionally defective, the subsequent in-court identification is admissible only upon proof by clear and convincing evidence that it rests on a source independent of the tainted identification. In *State v. Souza*, 110 R.I. 261, 292 A.2d 214 (1972), this court again refused to reverse a trial justice's admission of an in-court identification notwithstanding the existence of a constitutionally tainted pretrial identification. *Id.* at 267–68, 292 A.2d at 217–18. In *Souza*, the trial justice found that the in-court identification was based upon a source independent of the constitutionally defective pretrial identification. There, we noted that,

"[i]f the pretrial identification procedure is unconstitutional on either Sixth Amendment or due process grounds (or both), the *trial* identification by the same witness likewise may be inadmissible. With respect to the trial identification, however, the exclusionary rule is not a *per se* rule. Here it becomes relevant to determine the effect of the pretrial identification upon the trial identification. In some cases, the trial identification of a witness is admissible even though the witness identified the defendant at an unconstitutional pretrial confrontation. 1 Cipes, *Criminal Defense Techniques*, § 2.-04[2] at 2–12, 2–13 (1971)." *Id.* at 267, 292 A.2d at 218.

■ Furthermore, in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court enumerated five factors to be considered in determining if an in-court identification is based upon a source sufficiently independent of an unconstitutional pretrial identification so as to "purge the taint of" the prior unconstitutional identification. These five factors are (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. *Id.* at 114–15, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. In the instant case the trial justice made a thorough evaluation of the material facts before determining that Oliva's in-court identification rested on a sufficient independent source, *i. e.*, her encounter with Flynn during the course of the robbery itself. The trial justice determined, relying on the record, that Oliva had ample opportunity to view defendant Flynn during the commission of the robbery of the Bonded Vault. The record also clearly supports the trial justice's finding that the witness was possessed of "extremely acute powers of observation and recollection and attention." In regard to both the accuracy of her description of Flynn and her level of certainty in identifying him, we further find that her identification meets the criteria set forth in *Manson*. Finally, with respect to the fifth criterion set forth in *Manson*, we find nothing in the record to indicate that Oliva's recollection of the events of the robbery was in any way eroded by the passage of time between the robbery and her in-court identification of defendant Flynn.

Based upon the foregoing, our finding is that the trial justice did not err in admitting Oliva's in-court identification of defendant Flynn.

## IV

As their next specification of error, defendants claim that the trial justice committed error by refusing to permit defendant Flynn to testify on his own behalf. The state disagrees with defendants' characterization of the matter. Instead, it claims that we must focus upon whether or not the trial justice abused his discretion by ruling that defense counsel could not recall defendant Flynn as a witness.

The record shows that counsel for defendant Ouimette called Flynn as a witness for counsel's own client. Flynn testified as follows:

"Q Mr. Flynn, how old are you?

"A Thirty-six.

"Q Did you rob the Bonded Vault?
" * * *

"A No, I didn't.

"Q Do you know who did?

"A Yes, I do.

 "MR. CICILLINE: I have no further question.

 "MR. BROWER: No questions at this time, your honor.

 "THE COURT: What do you mean 'not at this time'?
" * * *

 "MR. BROWER: I don't know if there [will] be any other cross-examination that will open an area that has not been opened up. At this time, I have no questions."

The prosecutor proceeded to cross-examine Flynn, concentrating only on Flynn's

prior criminal record. He did not inquire about any matter raised during direct examination, namely, Flynn's possible alibi or his knowledge of the perpetrators' identity. Counsel for defendant Ouimette then attempted to reopen direct examination of Flynn. The trial justice sustained the prosecutor's objection thereto. Flynn's own counsel then tried to call Flynn. He, too, was unsuccessful.

At the side bar the prosecutor argued the propriety of his objections, saying that defendants deliberately schemed to "open the door" just barely on Flynn's direct examination and then to allow the rest of his story to come out under cross-examination by the prosecutor. Apparently, defense counsel would then put on Ouimette's own case through redirect and cross-examinations of Flynn. The prosecutor argued that defense counsel had initially limited the scope of examination and could not now expand examination beyond attempts to rehabilitate Flynn's character, which had just been attacked on cross-examination.

Counsel for defendant Flynn argued that Flynn had an absolute right to testify or not to testify on his own behalf. Further, testifying as a witness on behalf of another defendant did not preclude his basic right because his testimony as another's witness had no bearing on the outcome of his own separate trial, notwithstanding the joint proceedings against all defendants. Finally, Flynn's counsel argued that Flynn could testify on his own behalf only by being recalled. He reasoned that the nature of the then-extant direct and cross-examinations had so limited the scope of further examination that Flynn's own case would never properly be elicited. The defendant Ouimette's counsel stated that as a matter of trial tactics he and Flynn's attorney had decided to divide the task of examining Flynn as far as his testimony would relate to Ouimette's own case. The trial justice denied defendant Flynn the opportunity to take the stand, saying that counsel had waived putting in Flynn's direct case at the proper time when he had decided not to inquire at the end of the initial direct examination of Flynn.

We do not believe that the trial justice erred in his ruling. As we view the record, the determining factor is defense counsels' use of tactics in order to gain some strategic advantage. Their tactic failed. Yet in utilizing that strategy, they knowingly and intelligently waived any further right to regain control of Flynn as their own witness. The trial justice made available to defense counsel an opportunity to examine Flynn prior to the state's cross-examination, which offer they refused. It is beyond doubt in this jurisdiction that the determination of the order of proof is within the sound discretion of the trial justice. *State v. Mathias*, R.I., 423 A.2d 484, 487 (1980); *State v. LaPlume*, 118 R.I. 670, 681, 375 A.2d 938, 943 (1977). We shall not disturb his decision unless it is clear that he has abused his discretion or that substantial prejudice resulted from the order of proof. *Id.; State v. Mattatall*, 114 R.I. 568, 571, 337 A.2d 229, 232 (1975); *State v. Spivey*, 113 R.I. 1, 4–5, 316 A.2d 498, 501 (1974). The defendants have shown neither abuse nor prejudice.

The defendants argue in their brief that the actions of the trial justice, in denying defense counsels' request to recall Flynn to the stand, prejudice them in relation to the conspiracy count of the indictment. Since the indictment charged them all with conspiracy, they assert that evidence exculpating one of them under the conspiracy count would tend "to exonerate all others similarly charged." The defendants' assertion is mere speculation because there is no evidence of what the exculpatory evidence might have been. The defendants' argument would be meritorious if the trial justice had never given Flynn an opportunity to take the stand and to testify either for another defendant or on his own behalf. The record in the instant case reflects that the trial justice did provide an opportunity for Flynn's attorney to examine Flynn at the time he felt was propitious to an expedited and orderly trial.

The defendants chose their trial strategy. They waived their opportunity to elicit

what they now assert would have constituted exculpatory evidence from Flynn in the hope that the prosecutor would taken their bait on his cross-examination. The failure of the tactic may not be now used to revive their right to choose the course of their defense.

## V

The jury in this case was sworn on May 26, 1976. The state rested its case on July 8, 1976, and was followed in natural course by the defense, which itself rested on August 4, 1976.

On Saturday, July 17, the quarters of the sequestered jury were burglarized. Upon the discovery of the burglary of the jurors' quarters, the management of the Holiday Inn contacted the Providence police department. Detective William B. Giblin (Giblin) and at least one patrolman responded to the call. Although he later admitted his presence in the area of the jurors' quarters, Detective Giblin informed the trial justice that he had had "no personal contact" with any of the jurors at that time but that a patrolman had questioned them in reference to the reported burglary. In court on July 19 the trial justice asked the assembled jurors whether the burglary of the previous Saturday evening had affected the ability of any one of them to render an impartial verdict. The record shows that none of the jurors responded in the affirmative to the judge's query. Defense counsel then requested the trial justice to poll the jurors individually regarding whether or not they had been "influenced in any way by any police officer who responded" to the scene of the burglary of their quarters. This *in camera* examination was conducted on the afternoon of the nineteenth of July. On the following day the trial justice reminded defense counsel, outside the presence of the jury, that on the nineteenth he had "informed you gentlemen * * * what those questions were, and they are now a matter of record, because the court's examination of each juror is a matter of record." The trial justice conceded the theoretical possibility of improper influence on the jury but felt constrained to accept the responses of the individual jurors, each of whom reaffirmed his or her ability to render an impartial verdict.

On July 20, during the presentation of the defense case, all defendants moved to pass the case because of alleged prosecutorial misconduct. The basis for this motion was the fact that Detective Giblin, who served as the prosecution's case officer and was a key witness for the state as well, had reported to the scene of a burglary of the sequestered jurors' quarters at the Holiday Inn the previous Saturday evening. It should be noted that Detective Giblin's involvement in the state's case was more than peripheral or incidental. It was Detective Giblin who had interviewed some of the most important witnesses for the state, including Karyne Sponheim, Robert J. Dussault, Joseph A. Danese, and Barbara Oliva. Detective Giblin testified extensively regarding his conversations with these individuals and his subsequent investigation of their remarks. The defendants in their brief cite as error the action of the trial justice in refusing to pass the case upon learning of the involvement of Providence police detective William B. Giblin. Motions to pass are addressed to the sound discretion of the trial justice. His determination is to be accorded great weight and will not be disturbed on appeal unless clearly wrong. *State v. Pailin*, 114 R.I. 725, 729, 339 A.2d 253, 255 (1975). In *Chase v. DiMeo Construction Co.*, 100 R.I. 590, 217 A.2d 922 (1966), this court held that the trial justice had not abused his discretion in refusing to pass the case when the foreman and another juror, in the presence of their fellow jurors, stated that they each knew the brother of the plaintiff, who was serving as a witness for the plaintiff in the case. The trial justice was satisfied with the subsequent assurances of the members of the jury, including the foreman, that their impartiality remained unaffected by the incident. For this reason he denied defense counsel's motion to pass the case. We affirmed the trial justice's determination on

the motion to pass in *Chase*. In the instant case, the trial justice used every reasonable available means at his disposal to satisfy himself that no juror had been biased by the challenged incident. In light of the record before us, we find no abuse of discretion.

The defendants' second main claim of prosecutorial misconduct centers on the prosecution's alleged mistreatment of defense witness Eugene Floody, an employee of the Department of Business Records, Auto-Body Division. He testified on behalf of defendant Ouimette to corroborate the latter's alibi. Ouimette's counsel and other defense counsel joined in a motion to dismiss the indictment citing the alleged misconduct. Out of the jury's presence, defense counsel stated that on the evening of Floody's first day of testimony, the prosecutor and several police officers involved in the case had requested that Floody come to the Providence police station for questioning. According to defense counsel, Floody was "detained" for approximately three and one-half hours, called a liar by the prosecutor and the police, threatened with prosecution for perjury, and questioned about possible gambling debts he owed defendants and about money he might have received from them for some small construction work in his home. Defense counsel stated also that as a result, Floody's effectiveness as a witness was severely compromised. Furthermore, other defense witnesses whom counsel had informed in good faith of the possibility that police would interrogate them were now beginning to refuse to testify.[11]

The prosecutor replied that legitimate investigation had cast some doubt upon Floody's veracity. The prosecutor stated that when police located Floody at his home, they did not arrest him and that Floody voluntarily went to the police station in his own car. The prosecutor also said that Floody was at all times free to leave the police station.

At the interrogation or interview, Floody was shown several records that apparently contradicted his testimony regarding his whereabouts and thus his capability to place defendant Ouimette away from the scene of the robbery. As a result, Floody was informed that he could be charged with perjury. However, the prosecutor denied that Floody was ever intimidated, coerced, or physically threatened.

Out of the jury's presence, Floody testified under examination by the trial justice that he had told the prosecutor and the police that his earlier testimony was true. He also stated that the prosecutor had not believed him and that the prosecutor had said that he would charge Floody with perjury.

The trial justice ultimately ruled that the events complained of did not adversely affect appellant Ouimette's right to due process. The alleged intimidation of a witness is perforce a serious matter and to prevent a defense witness from testifying, by force or threat, can severely hobble a defendant's ability to present his case in its most favorable light. In *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), the United States Supreme Court reversed the petitioner's conviction because his only witness had refused to testify after hearing the trial judge address him on the danger of committing perjury. The witness had a prior criminal record and at the time of the petitioner's trial he was serving a sentence. When the witness was called, the trial judge admonished the witness to tell the truth, stating that if he were to lie, he would be indicted for perjury and his sojourn in prison would be lengthened. The witness then refused to testify and was excused by the court. The Supreme Court reversed the conviction for the unnecessarily harsh terms used by the trial judge and the prejudicial impact they had on the petitioner's case.

The facts of the case at bar show rather different circumstances. Floody tes-

---

11. Counsel also informed their witnesses that they were under no obligation to talk with the police.

tified fully on his first day in court under direct and cross-examination. His credibility was an issue for the jury to decide and they remained totally unaware of the events that occurred at the police station. Most important, however, as the trial justice stated, Floody did not later reappear in court to recant his testimony. Through it all Floody stuck to his original testimony. We feel that without knowledge of that meeting the jury was still well able to evaluate Floody's testimony. Hence, we shall not find reversible error.

At a later point in the trial, Ouimette's counsel moved the trial justice to permit surrebuttal testimony. Counsel sought through additional witnesses, other employees of the body shops, to show that Floody had indeed appeared at those shops on the days in question. The trial justice denied his request.

The defendant Ouimette asserts as error the trial justice's refusal to admit his surrebuttal evidence to support his alibi. Floody had originally testified that on the morning of the robbery he had seen Ouimette at an auto-body shop he was inspecting for the state. The state called a series of witnesses in rebuttal who were employees and managerial personnel of several such shops that Floody claimed to have visited both on and around the day of the robbery. They all testified that they had not seen Floody. Defense counsel, including counsel for Ouimette, cross-examined each of these witnesses.

Ouimette argues that the trial justice's decision adversely affected his constitutional right to present a defense. Speaking to this issue, the United States Supreme Court said in *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, (1967), that the right to present a defense includes the right "to offer the testimony of witnesses, and to compel their attendance, if necessary * * *." The defendant contends that this general rule compels the admission of any surrebuttal testimony that is material and relevant to the presentation of a defense; however, we note that *Washington v. Texas* decided merely that the

Sixth Amendment right to compulsory process applies to the states via the Fourteenth Amendment and held invalid a state statute that disqualified an alleged accomplice from testifying for the defense. Although we freely endorse the above quotation from *Washington*, we conclude that the cited case is inapposite to the instant case. The facts in the case at bar require close scrutiny of the nature of the claim and the testimony. Reliance on the broad, albeit cogent, definition in *Washington* is therefore not the proper avenue of our analysis.

█ The substance of the testimony shows a contradiction regarding the whereabouts of Floody. Ouimette placed himself, according to his alibi, at one of the shops that Floody stated he inspected on August 14, 1975. Floody so testified in order to corroborate the alibi. The state's witnesses stated that Floody was not present at the shops in question, thereby tending to refute defendant's alibi indirectly. The apparent goal of defendant's proffered surrebuttal was merely to reiterate Floody's presence at the shops. Under these circumstances, the exclusion of the proffered surrebuttal was entirely proper.

This court has already held that a witness may not be recalled to reiterate his position when his testimony is denied by a rebuttal witness. *Campbell v. Campbell*, 30 R.I. 63, 73 A. 354 (1909). We have also held that the decision to admit or exclude cumulative evidence must be left to the sound discretion of the trial justice. *Morrarty v. Reali*, 100 R.I. 689, 219 A.2d 404 (1966).

The standard for permitting surrebuttal was well stated by the Illinois Appellate Court in *Ross v. Danter Associates, Inc.*, 102 Ill.App.2d 354, 242 N.E.2d 330 (1968):

"The purpose of surrebuttal is to permit the defendant to introduce evidence in refutation or opposition to new matters interjected into the trial by the plaintiff on rebuttal. [Citations omitted.] In other words, fairness requires that the defendant be permitted to oppose new matters presented by plaintiff for the first time which the defendant *could not have presented or opposed at the time of*

*presentation of his main case.* Contrariwise, the purpose of surrebuttal is not the introduction of evidence merely cumulative to that presented by the defendant in its original presentation. [Citations omitted.] *It follows that the defendant has no right to present surrebuttal evidence merely because the plaintiff has presented rebuttal evidence."* *Id.* at 367–68, 242 N.E.2d at 336–37. (Emphasis added.)

The issue at bar is governed by *Campbell* and *Morrarty, supra.* Here, although counsel for defendant Ouimette did not attempt to recall Floody himself on this matter, the thrust of the testimony would have been similarly cumulative and reiterative.

■ The crucial consideration on this issue is whether defendant could have presented the testimony offered to contradict the rebuttal testimony in his case in chief. *See People v. White,* 14 Ill.App.3d 1079, 303 N.E.2d 36 (1973). Here the answer is that defendant clearly could have done so. We do not deny that the proffered testimony is material and relevant; however, it was also material and relevant, albeit cumulative, before the state's rebuttal. *Cf. People v. White, supra* (surrebuttal was immaterial and irrelevant in defendant's case in chief; made material and relevant only by new matter contained in prosecution's rebuttal). We therefore find no reversible error in the trial justice's ruling.

A third claim of alleged prosecutorial misconduct involves statements made to the state's witness Robert J. Dussault by Providence police and Rhode Island State Police while Dussault was in custody in Las Vegas, Nevada. On January 3, 1976, Detective Giblin informed Dussault that he had heard that defendant Flynn had been killed within the past several days. Dussault testified out of the jury's presence that this knowledge prompted him to talk to police about the robbery. Detective Giblin testified that he and Sergeant Anthony Mancuso of the Rhode Island State Police had been searching for Flynn and that in De-

cember 1975 they had learned of Flynn's purported death from the FBI.

■ All defense counsel moved that the indictment be dismissed, arguing that the false and exaggerated report of Flynn's death had an unconstitutionally coercive influence upon Dussault. The trial justice denied these motions. At the same time he ruled that the events and conversations of January 3, 1976, were inadmissible for the jury's consideration. The trial justice concluded that the information imparted to Dussault was merely erroneous rather than intentionally false. The trial justice felt, as we do, that at all times through January 3, 1976, both Giblin and Mancuso had had a good-faith belief in the truthfulness of the FBI's information. Furthermore, there appeared no reason for them to discount the news when it followed a search for Flynn that had turned up nothing. The trial justice's ruling was designed to avoid any prejudicial effect on the jury. He recognized that such testimony added little to the sizable accumulation of evidence presented by the state's case. We believe his ruling proper. *Cf. State v. Reardon,* 101 R.I. 18, 219 A.2d 767 (1966).[12]

## VI

Next, defendants claim error as a result of the trial justice's admission into evidence testimony of their alleged acts and statements in Las Vegas, Nevada, between November 10 and 16, 1975. According to defendants, the substance of the challenged testimony was that defendants Flynn and Byrnes, with the witness Danese, went to Las Vegas on orders from defendant Ouimette to "coerce" the witness Dussault into silence. An article in the Providence Journal-Bulletin had detailed an agreement between the authorities and Dussault for his testimony.

■ The defendants argue for the fist time on appeal that such testimony was inadmissible because it went beyond the scope of the original indictment. They urge that the testimony was inadmissible and

---

12. We, therefore, need not address the issue of defendants' standing to assert objection to alleged coercive influences exercised upon Dussault.

prejudicial because it was introduced purportedly "to show the character" of defendants and therefore to prove them guilty of the robbery. The defendants have failed to cite any reference to the record in support of their claims. Our examination of the record, however, indicates that defendants made no proper objection when the challenged testimony was adduced. The defendants must necessarily be deemed to have waived their claims related thereto.

VII

The defendants next urge reversal of their convictions on the ground that the trial justice denied them the right of full cross-examination of several witnesses, in violation of their rights under the Sixth and Fourteenth Amendments to the United States Constitution. The defendants assert that the trial justice prevented defense counsels' "relevant and material" cross-examination in their "attempts to impeach the credibility of prosecution witnesses by exposing examples of possible motivation[s] to perjure themselves in the State's favor." In their brief, defendants detail the circumstances of the state's objections to questions asked of witnesses Karyne Sponheim, Detective Vincent D'Elia, and Joseph A. Danese by defense counsel.

Effective cross-examination of witnesses forms an important part of our justice system. The United States Supreme Court stated long ago in *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), that the Sixth Amendment to the United States Constitution establishes a "substantial right" of cross-examination. It is "one of the safeguards essential to a fair trial." *Id.* at 692, 51 S.Ct. at 219, 75 L.Ed. at 628. Later, the Supreme Court made the right of cross-examination applicable to state criminal trials by incorporating the right into the Fourteenth Amendment's Due Process Clause. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). In *Pointer*, the Court emphatically reiterated its view, stating:

"There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expression of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law." *Id.* at 405, 85 S.Ct. at 1068, 13 L.Ed.2d at 927.

The importance of cross-examination as a factfinding tool cannot be gainsaid. In our decisions we have repeatedly said that the basic purpose of cross-examination is to impeach the credibility of a witness by discrediting the testimony adduced on direct examination. *See State v. Eckhart*, 117 R.I. 431, 435, 367 A.2d 1073, 1075 (1977); *The Atlantic Refining Co. v. Director of Public Works*, 102 R.I. 696, 713, 233 A.2d 423, 432 (1967). Not only is the right of cross-examination guaranteed and made applicable to the states by the Federal Constitution but art. I, sec. 10 of the Rhode Island Constitution also establishes the right. *State v. Meyers*, 115 R.I. 583, 589–90, 350 A.2d 611, 614 (1976).

The issue that defendants raise before us concerns the proper scope of their cross-examination. As valuable a factfinding device as cross-examination is, the practical problem that it invariably addresses is "proper scope." What areas of a witness's testimony, knowledge, or background are legitimately subject to probe upon cross-examination? Naturally, the tension of this problem lies between protection of the accused's right to a fair trial and the witness's right to be free of undue harassment. Appellate courts have traditionally left resolution of this problem, in the first instance, to trial justices. It is the trial justice who is charged with the responsibility of conducting a smooth and efficient trial while assuring that the rights of all persons concerned therewith are protected. The Supreme Court in *Alford v. United States*, 282 U.S. at 694, 51 S.Ct. at 220, 75 L.Ed. at 629, stated:

"The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. It may exercise a reasonable judgment in determining when the subject is exhausted."

Our decisions are in accord. *See State v. Eckhart*, 117 R.I. 431, 367 A.2d 1073 (1977); *State v. Ciulla*, 115 R.I. 558, 351 A.2d 580 (1976); *State v. Carraturo*, 112 R.I. 179, 308 A.2d 828 (1973). We now turn to consider individually the trial justice's rulings regarding each above-named witness.

The state called Karyne Sponheim to testify regarding her meeting defendants in Las Vegas and her intermittent contact with them, covering approximately a four-and-one-half month period from mid-August through December 1975. Defense counsel cross-examined her extensively about her meetings and contacts with defendants. They also attempted to elicit from her a motive for testifying, trying to establish the fact that either the FBI or the Rhode Island State Police promised her lenient treatment regarding threatened and possibly pending criminal charges against her in exchange for her testimony as a prosecution witness. The following questions and answers appear in the record:

"Q Prior to your giving the statement, the tape recorded statement, were you promised anything so far as you would not be prosecuted for anything if you were to cooperate?

"A No.

"Q You weren't? Well, didn't you tell us before you went on the tape, Sergeant Mancuso threatened you, came down heavy on you, and I could ask the FBI, Agent Scobie, how heavy he came down on you, and how he threatened you?

"A Yes.

"Q Okay, and what did he threaten you with?

"* * *

"THE COURT: * * * Is there anything further that he threatened you with Miss Sponheim?

"WITNESS: Conspiracy after the fact, * * *

"* * *

"Q Well, when you say he threatened you, did he threaten you by saying unless you cooperate with us, and unless you give us a statement, this is what can happen to you, and you could be prosecuted for this, and we are going to get you for that, isn't that what you're talking about when you say threats and he came down heavy on you?

"A Basically."

[The questions and answers continued.]

"Q What did you say?

"A I said you don't have to threaten me because I didn't do anything wrong, and I came here on my own volition, and no one forced me to come here."

Of particular interest to defense counsel was the witness's alleged involvement in criminal activity on two separate occasions, and the possibility that law-enforcement authorities offered her a deal based on her alleged conduct. The record also indicates the following:

"Q Were you promised anything by the FBI after you or during the time you gave statements to them concerning yourself—

"MR. DeROBBIO: Objection.

"MR. BROWER: May I finish?

"* * *

"Q —in conjunction with your testimony in this particular case, or your cooperation in this particular case?

"MR. DeROBBIO: I am going to object. The FBI could absolutely offer this woman nothing in the State of Rhode Island. They have no authority whatsoever, your honor, in conjunction with the testimony here.

"MR. BROWER: I am not talking about the State of Rhode Island. I think that it's quite conceivable that the F.B.I. could be concerning her testimony in this particular case give her some promises or rewards concerning activity in other states. I think that the statements made by Mr. DeRobbio

on the FBI could give her nothing in the State of Rhode Island, while it is true as far as it goes, the FBI could make promises or give inducements regarding testimony within the State of Rhode Island.

"THE COURT: I am reflecting on whether or not it might be shown to the jury that promises were made if she were to testify in this matter. I'm not concerned about any other matters so far as this jury is concerned. Her credibility and whatever weight they will give to her testimony will depend upon what they deduce was her reason for testifying, and that might be a factor. So I guess the simple question here is did they promise her anything if she would testify here. I couldn't see it beyond that, Mr. Brower, unless you could point it out to me.

"MR. BROWER: That's what I'm asking for, her cooperation regarding this matter.

"THE COURT: What's wrong with that?

"MR. DeROBBIO: Nothing wrong with that question as phrased regarding this case.

"THE COURT: Yes.

"Q Did you receive any promises from the FBI with regard to your cooperating in this matter here?

"A No one has promised me anything about anything. I came here just to tell the truth. I didn't come here because I have anything to hide. I came here because I was subpoenaed and I have nothing to hide.

"Q Didn't you have a conversation with Mr. Percell after January 4th where you told him you were scared?

"MR. DeROBBIO: Objection.

"THE COURT: I will sustain the objection.

"Q Did you have a conversation with Mr. Percell telling him that you were involved in two other matters?

"MR. DeROBBIO: Objection, your Honor. It is highly prejudicial, highly immaterial, not probative.

"THE COURT: Sustained.

"MR. DeROBBIO: And I ask he not engage in this type of questioning.

"THE COURT: Sustained. The jury will disregard it. We will deal with the evidence as it comes in.

"* * *

"MR. BROWER: I would like to make an offer of proof.

"* * *

[At the side bar:]

"MR. BROWER: Yes. I would represent to you that I would expect to deduce testimony that after January 4th that there [were] conversations between this witness and [Richard Percell] which would indicate or which would prove that this party could, through conversations with the FBI, had implicated herself as an accessory to robbery in two jurisdictions, one in Worcester and one, I believe it's Virginia, some southern state, and this party was very concerned about her, and felt that the only way there would be nothing done to her would be if she would cooperate with the people from Rhode Island, and give complete and full statements.

"* * *

"THE COURT: What I like to point out, I think you have established that foundation already. Her last statement is this, she says no one has promised me anything about anything. I take that to mean that nobody has given her any promises or inducements to testify, whether it be by way of financial inducements, immunity from prosecution. That means that's as blanket a statement as I can get.

"MR. BROWER: I just wanted to make sure it is on the record.

"THE COURT: This is the point. I don't think you have to refresh her recollection. She denies it. If you have somebody who can come in [Mr. DeRobbio has] got a right to recall her on rebuttal."

There was no further cross-examination of this witness concerning her motive. We feel that the trial justice did not abuse his discretion in sustaining the state's objections to such further questioning or in deferring defendants' offer of proof to a later time. A similar situation was presented in *State v. Potts*, 239 Mo. 403, 144 S.W. 495 (1912). In that case, the Missouri Supreme Court determined that the trial judge acted well within his discretion in barring cross-examination regarding the chief witness's purported agreement with police. The defendant argued to the court that the trial judge should have allowed him to question the witness about whether he had agreed with the prosecutor to testify in exchange for the dismissal of the charges against him. The court examined the record and found that defense counsel had asked the witness about a possible agreement several times. Each time, the witness "expressly denied that any promise had been made to him by any person, and stated that his testimony against himself and the defendant was entirely voluntary." *Id.* at 413, 144 S.W. at 498. In the case at bar the record clearly shows that Sponheim twice responded to similar questions that she had not received promises in exchange for her testimony and that her sole desire in testifying was to be truthful. We think her appearance in court under subpoena is of no moment in light of her consistent denial of a deal.

At a later point in the trial, defendants recalled to the stand Richard Percell, who had earlier testified for the state. The defendants put him on the stand in order to establish that he had had a telephone conversation with Sponheim in mid-January 1976. Defense counsel tried to elicit from Percell that Sponheim's association with prosecution witness Dussault and with defendants most likely caused her to make a deal with law enforcement authorities.

The substance of the relevant portion of his testimony is that when he spoke with Sponheim on the telephone in mid-January, he did not know she had given a statement to the authorities. He testified concerning the content of that phone call out of the jury's presence. Under examination by defense counsel, Percell said that Sponheim had told him that she was "scared" and in contact with the FBI. She said that she was afraid because she knew that defendant Flynn and prosecution witness Dussault had been arrested. Percell stated his belief that she feared being connected to them, although she never told him this directly. He further testified that he recalled for her certain facts. In particular, he told her that Dussault had given him a large amount of money. According to Percell's testimony Sponheim responded, "I know where he got it. It was from a robbery back East, just not too long ago." Sponheim also told him that she had waited in Dussault's car while he robbed the bank.

Our close examination of the record reveals that defendants sought to raise from Percell's testimony inferences that Karyne Sponheim had made a deal with authorities to testify in exchange for her freedom from any prosecution. Defense counsel attempted to draw the inference first that the authorities made Sponheim aware of Dussault's gift to Percell before Percell informed her of it. Second, defense counsel sought to infer that her knowledge of events, actions, and contacts involving Dussault and several of defendants would lead to institution of proceedings against her. Defense counsel ultimately sought to infer that as a result she felt impelled to make her alleged deal.

After listening to the testimony of Percell and after reviewing his notes of Sponheim's testimony, the trial justice concluded her testimony was voluntary. The trial justice therefore refused to permit the jury to hear Percell's testimony.

The main weakness of defendants' position on this issue is that they failed to provide any independent, direct evidence of a promise or inducement given to Sponheim. As the trial justice pointed out, defendants did not confront her with any such fact while she was testifying, and, therefore, never established a predicate for the relevance of the testimony they sought to

introduce. Nowhere in the record is there to be found a statement of Percell to indicate that a promise or an inducement was made to Sponheim in return for her testimony.

 It is well settled in this jurisdiction that questions of the relevance of testimony lie within the sound discretion of the trial justice. *State v. Camerlin*, 116 R.I. 726, 729, 360 A.2d 862, 865 (1976); *State v. Verdone*, 114 R.I. 613, 617, 337 A.2d 804, 808 (1975). In the instant case the trial justice determined that Sponheim's testimony was "voluntary". In so doing, he was in effect determining the relevance of Percell's testimony. We agree that such testimony had no probative value concerning the issue of whether Sponheim was biased against defendants. Therefore, we conclude that the trial justice acted well within his discretion when he excluded Percell's testimony.

The state called Detective Vincent D'Elia, a twenty-one-year veteran of the Providence police department, as a witness. He testified that at the time of the robbery he was assigned to the department's Bureau of Criminal Identification. Generally, his duty was to collect evidence at crime scenes. This included both photographing particular locations and articles, and searching for fingerprints. He testified also that on August 15, 1975, the day following the robbery, he proceeded to a parking lot located at Summer and Conduit Streets in Providence to investigate a report of a stolen panel truck allegedly used in connection with the robbery. Among other things, Detective D'Elia found a palm print "on the vent window of the driver's side." The defendants assign as error the trial justice's refusal to permit cross-examination relating to identification of the palm print.

The following cross-examination appears in the record:

"Q Now as to the palm print that you took of the van, did you use that as a basis for comparison of anything?

"A Yes, I did.

"Q And when did you do that?

"A All different dates.

"Q Pardon me?

"A There was all different dates on that there.

"Q Do you have your notes with you?

"A Not on the palm prints, no.

"Q Well, were you submitted palm prints of the defendants in this case?

"MR. DeROBBIO: Objection.

"THE COURT: Sustained.

"MR. BROWER: Well may I be heard, your Honor?

"THE COURT: Certainly.

"MR. BROWER: It's been evidence that a palm print was taken, put in direct examination.

"THE COURT: I understand that. No evidence as to whose they were. Any identification as to whose they were?

"MR. BROWER: The prosecution cannot leave that standing on direct examination that a palm print is taken, and leave it there so an inference can be drawn either way."

The trial justice sustained the state's objection to defense counsel's line of questioning and denied the latter's motion to strike the reference in the direct examination to the palm print.[13]

 The trial justice acted well within his discretion in so ruling on this matter. As the trial justice stated, the prosecution did not put into evidence any identification adduced from the palm print. Nor did the prosecution try to establish that the witness even tried to make an identification of the print. The state did not provide a foundation of evidence leading ultimately to an identification, for it did not inquire concerning any procedures the witness may or may not have performed relative to the print. In our view, defense counsel merely tried to anticipate evidence that the prosecution, for whatever reason, chose not to enter at that time.

13. The defendants later recalled the witness who testified on their direct and cross-examination that he made no connection between the palm print and defendants. This is an entirely proper method. *Cf. State v. Thornley*, 113 R.I. 189, 319 A.2d 94 (1974).

When defendants recalled the witness, they were free to extract from him their desired testimony. On their direct and cross-examinations defendants were able to put into evidence that the witness had indeed made several comparisons and that, ultimately, he had been unable to positively identify the print as belonging to any of them. The defendants were then entitled to such information by asking foundation questions concerning investigatory methods and comparison. Since these questions did not appear in the state's direct examination, defendants' attempts to cross-examine the witness at that point in the trial went beyond the scope of direct examination, merely anticipating possible future evidence. *Cf. State v. Mastracchio*, 78 R.I. 496, 82 A.2d 889 (1951).

The final witness we consider, Joseph A. Danese, an admitted participant in the burglary, testified at great length for the state under a promise of immunity. The defendants first assert that the trial justice wrongly prevented cross-examination concerning the witness's employment background. However, defendants made no objection to the trial justice's ruling, and they must therefore be deemed to have waived their appeal on this point. *State v. Cline*, R.I., 405 A.2d 1192, 1209 (1979); *State v. Quattrocchi*, 103 R.I. 115, 117, 235 A.2d 99, 101 (1967).

Defense counsel moved onto other areas in their extensive cross-examination of the witness, and we take cognizance of their further objections. Once again, the central theme of their argument is that the trial justice unduly restricted the scope of cross-examination, thereby contravening defendants' constitutional rights under the confrontation clause. Our perusal of the record reveals that the trial justice did not abuse his discretion in excluding the contested questions. On the contrary, we uphold his rulings on evidentiary grounds that do not and need not bear upon any constitutional considerations.

The record notes defense counsel's attempt to impeach through the use of a prior inconsistent statement.

"Q Mr. Danese, it's a fair statement to say, is it not, that until such time as Mr. Dussault had concluded his testimony, in the bail hearing, that you never gave any of the details that you have given here today in court to anyone?

"MR. DeROBBIO: Objection.

"THE COURT: Read it, please.

[Read]

"THE COURT: Sustained.

"MR. BROWER: Note my objection.

"Q Now, Mr. Danese, you said that on August 14th you got into this van, and you, I believe you first testified, you changed into overalls, is that correct?

"A I did not change. I put them over the clothes that I had on.

"Q Well, Wednesday—strike that. Last week when you were testifying in direct examination, didn't you say that— just to direct your attention to the area, Mr. Danese—before Mr. DeRobbio asked you the question: Did anybody take off his clothes, before that, in response to a question from Mr. DeRobbio, didn't you say: 'We got in the van and we changed into the overalls'?

"MR. DeROBBIO: I'm going to object.

"THE COURT: Sustained.

"Q Did you change into the coveralls?

"A We—

"MR. DeROBBIO: Objection.

"THE COURT: Overruled.

"A We put the coveralls on over the clothing that we did have on.

"Q Well, I'm asking, is that what you did?

"A If you call that changing, that is changing.

"Q Do you call that changing, Mr. Danese?

"MR. DeROBBIO: Objection.

"THE COURT: I will allow it.

"A I would call it changing.

"Q Now you had some conversations, didn't you, with Mr. DeRobbio, as to the importance of no one taking off his

clothes and changing that way into coveralls?

"Mr. DeROBBIO: I am going to object. It's argumentative and it asserts a fact that he's ready to prove, and he should be put to the proof. Is he going to assure the Court he is going to prove this fact?

"THE COURT: Are you, Mr. Brower?

"MR. BROWER: No, I'm not, your Honor, and I don't believe I have to.

"THE COURT: I will sustain the objection.

"MR. BROWER: Note my objection, you Honor. I believe I am entitled—

"THE COURT: I have heard it.

"MR. BROWER: May I approach the bench?

"THE COURT: Certainly.

"[at the bench]

"MR. BROWER: May it please the Court, the defendant moves to pass under the terms of *Davis v. Alaska*, in that the Court is restricting the cross-examination to areas which should only be restricted on direct, in preventing the defendant from establishing the theory of defense to cross-examination, that the ruling that in cross-examination every question that is asked, even if it asserts a fact which can be denied or affirmed by the witness on the stand, must first be represented to be proven[,] not only is not in accordance with *Davis vs. Alaska*, but is in violation of the defendant's presumption of innocence of the constitutional rights. The defendant moves to pass.

"MR. DeROBBIO: If your Honor please, the only time I made objections to questions in this area is when there was an assertion in the question itself, that there was some allegation to the fact that certain facts were established or could be established by the defendant. And I feel that it is proper for the Court to demand of a defendant to be able to guarantee or an assurance that there will be proved at a later date, and this would be entered on a de bene basis with a question. This is one way of getting to the truth of the matter. But when a person, rawly brings in an allegation of fact in a question, and there is no assurance that it ever would be proved by the defendant, then I think it is an improper question in form, and the question should be asked in another way.

"THE COURT: The Court has made its ruling to the objection to the question. The motion to pass is denied.

"MR. BROWER: Note my objection."

▪ On the basis of the foregoing excerpt, we hold that defense counsel's attempts to elicit from the witness prior inconsistent statements must fail because of the lack of any properly established foundation. Defense counsel's attempts to impeach by the use of prior inconsistent statements did not properly refer the witness to the time, place, or circumstances of the supposed inconsistency. *Dixon v. Royal Cab Co.*, R.I., 396 A.2d 930, 934 (1979); *State v. Vaccaro*, 111 R.I. 59, 64–65, 298 A.2d 788, 791 (1973). Where no proper foundation has been established, we shall not permit such questions, that attempt to attribute to a witness testimony that is not his or such questions that falsely assume that the witness had previously testified differently. *See* 2 Underhill, *Criminal Evidence* § 495 (5th ed. cum. supp. 1978); 3 Wigmore, *Evidence* § 780 (Chadbourn rev. 1970).

## VIII

As their final claim of error, defendants allege that they were indicted by an illegally constituted grand jury, an error rendering the indictments against them constitutionally defective. The defendants rely first on *State v. Jenison*, R.I., 405 A.2d 3 (1979), where we held unconstitutional a grand-jury selection process that systematically excluded members of the college and university academic community from jury service. They argue that our ruling in *Jenison* applies to them through the limited retroactive application provision given that

rule in *State v. O'Coin*, R.I., 417 A.2d 310 (1980). In *O'Coin*, we permitted the defendant to challenge the composition of the grand jury that indicted her, notwithstanding her failure to timely file her objection in accordance with Rule 12(b)(2) and (3) of Super.R.Crim.P.[14] That rule requires criminal defendants to make such objections within twenty-one days after entry of a plea and before trial. We allowed her challenge and quashed her indictment because, although untimely, she actually had raised her objection prior to the commencement of her trial. Subsection (b)(2) of Rule 12 allows a trial justice, in his discretion, to rule on such motions filed out of time for cause. We determined that the defendant showed sufficient cause because the grand jury indicted her before our decision in *Jenison* and therefore before she could have used the new rule in a pretrial motion. *State v. O'Coin*, R.I., 417 A.2d at 313.

We distinguish *O'Coin* from the case at bar. Here defendants failed to challenge the grand jury composition not only before trial, but also at any time prior to their conviction. Consequently, defendants raise the issue on appeal for the first time on appeal. In *State v. Morin*, R.I., 422 A.2d 1255 (1980), we said that under these circumstances the case is governed by the rulings of the United States Supreme Court in *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973); and *Shotwell Manufacturing Co. v. United States*, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357, *reh. denied*, 372 U.S. 950, 83 S.Ct. 931, 9 L.Ed.2d 975 (1963). In order to avoid the penalty of waiver, the result of an untimely motion or a motion never filed, a defendant must show good cause as well as actual prejudice. *State v. Morin*, R.I., 422 A.2d at 1256. In the in-

stant case, defendants have demonstrated neither. Therefore, we must rule that the matter is waived.

The defendants claim that they indeed filed a motion to dismiss the indictment against them before the trial but that the trial justice inadvertently failed to rule on the matter because of the vastness of the case and the volumes of paper it generated. The defendants argue that their motion is therefore still pending and that we must remand the case for a hearing on the matter. They are, however, partially mistaken. Our thorough search of the record reveals that defendants in fact filed such a pretrial motion on February 16, 1976 (beyond the twenty-one day post pleading time requirement of Rule 12(b)(3)). However, the basis of the motion did not concern the composition of the grand jury. Rather, defendants argued to the trial justice that the prosecution had coerced several key witnesses to testify as they had before the grand jury and as they would likely testify at trial. As a result of the colloquy before the bench, the trial justice concluded that defendants' arguments were actually addressed to the question of bias or interest and ultimately concerned the credibility of these witnesses. The trial justice stated, and we concur, that "no question of the validity of the indictments has been raised." He then denied the motions, acting well within his discretion. We therefore adhere to our ruling that defendants may not raise the issue on appeal of the composition of the grand jury that returned their indictments when they have failed to raise the issue properly below.

In their brief, defendants raise a related issue concerning the trial justice's order that the jury be sequestered during the trial. The defendants claim that the length of the trial prevented many people from

**14.** Rule 12(b)(2) and (3) of Super.R.Crim.P. provides in pertinent part:

"(2) [D]efenses and objections based on defects in the institution of the prosecution or in the indictment, information, or complaint * * * may be raised only by motion before trial. * * * Failure to present any such defense or objection * * * constitutes a

waiver thereof, but the court for cause shown may grant relief from the waiver.

"(3) The motion shall be made no later than twenty-one (21) days after the plea is entered * * * but in any event the court may permit the motion to be made within a reasonable time after the plea is entered * * *."

serving because of the "severe restriction sequestration [imposed]." The defendants requested that the trial justice reconsider his order because, they claimed, the jury was up until then composed largely of women who were either housewives or who were working to supplement their spouses' income.

■ The defendants argued to the trial justice, and assert here as well, that such a jury does not represent a "fair cross-section of the community," in violation of *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) and *State v. Jenison*, R.I., 405 A.2d 3 (1979). The trial justice temporarily denied their motion, pending any situation that would warrant reconsideration before the impaneling of the jury. The defendants point to no other place in the record, nor can we find any instance, where they again raised the issue before the trial justice. Ultimately, however, we find determinative of the matter the fact that all the defendants expressly stated their satisfaction with the composition of the jury just prior to its being impaneled. In view of the fact that the defendants proceeded to trial without renewing their objection, they cannot now be heard to argue that the jury's composition violated their constitutional rights.

For all of the foregoing reasons, the defendants' appeals are denied and dismissed; the judgments of conviction entered against them are affirmed. The papers in this case are remanded to the Superior Court.

BEVILACQUA, C. J., and SHEA, J., did not participate.